NORTH CAROLINA SCHOOL BOARDS ASSOCIATION; WAKE COUNTY BOARD OF EDUCATION; DURHAM PUBLIC SCHOOLS BOARD OF EDUCATION; JOHNSTON COUNTY BOARD OF EDUCATION; BUNCOMBE COUNTY BOARD OF EDUCATION; EDGECOMBE COUNTY BOARD OF EDUCATION; AND LENOIR COUNTY BOARD OF EDUCATION v. RICHARD H. MOORE, STATE TREASURER; ROBERT POWELL, STATE CONTROLLER; DAVID McCOY, STATE BUDGET OFFICER; PHILLIP J. KIRK, JR., CHAIRMAN OF THE STATE BOARD OF EDUCATION; MICHAEL E. WARD, STATE SUPERINTENDENT OF PUBLIC INSTRUCTION; ROY COOPER, ATTORNEY GENERAL OF NORTH CAROLINA; E. NORRIS TOLSON, SECRETARY OF THE NORTH CAROLINA DEPARTMENT OF REVENUE; LYNDO TIPPETT, SECRETARY OF THE NORTH CAROLINA DEPARTMENT OF TRANSPORTATION; CAROL HOWARD, NORTH CAROLINA COMMISSIONER OF MOTOR VEHICLES; MOLLY CORBETT BROAD, PRESIDENT OF THE UNIVERSITY OF NORTH CAROLINA; JAMES MOESER, CHANCELLOR OF THE UNIVERSITY OF NORTH CAROLINA AT CHAPEL HILL; MARYE ANNE FOX, CHANCELLOR OF NORTH CAROLINA STATE UNIVERSITY AT RALEIGH; WILLIAM G. ROSS, JR., SECRETARY OF THE NORTH CAROLINA DEPARTMENT OF ENVIRONMENT AND NATURAL RESOURCES; JIM FAIN, SECRETARY OF THE NORTH CAROLINA DEPARTMENT OF COMMERCE; CARMEN HOOKER BUELL, SECRETARY OF THE NORTH CAROLINA DEPARTMENT OF HEALTH AND HUMAN SERVICES; L. THOMAS LUNSFORD, II, EXECUTIVE DIRECTOR OF THE NORTH CAROLINA STATE BAR; RAYMOND W. GOODMAN, JR., CHAIRMAN OF THE NORTH CAROLINA EMPLOYMENT SECURITY COMMISSION; SANDRA O'BRIEN, EXECUTIVE SECRETARY OF THE NORTH CAROLINA BOARD OF EXAMINERS OF PLUMBING, HEATING AND FIRE SPRINKLER CONTRACTORS; ROBERT L. BROOKS, EXECUTIVE DIRECTOR OF THE NORTH CAROLINA BOARD OF EXAMINERS OF ELECTRICAL CONTRACTORS; DOUGLAS H. VAN ESSEN, EXECUTIVE SECRETARY OF THE NORTH CAROLINA BOARD OF COSMETIC ART EXAMINERS; EACH OF WHOM IS SUED IN HIS OR HER OFFICIAL CAPACITY ONLY

No. 569A03

(Filed 1 July 2005)

**1. Penalties, Fines, and Forfeitures— payments for late filings, underpayments, and failure to comply with Revenue Act**

The Court of Appeals erred by holding that payments collected by the Department of Revenue under N.C.G.S. §§ 105-113.89, -163.8, -163.15, -163.41, and -236 for late filings, underpayments, and failure to comply with various provisions of the North Carolina Revenue Act were not subject to Article IX, Section 7 of the North Carolina Constitution, because: (1) Article IX, Section 7 applies to the penal laws of the State, meaning those statutes imposing a monetary payment for their violation and which are punitive rather than remedial in nature; (2) interpretation of our state statutes is not governed by the interpretation of a federal statute by a federal court; (3) the collection of the penalty as an additional tax is not determinative that the penalty is remedial; (4) the purpose of interest on deficient or delinquent

tax payments is to reimburse for loss of use of money during the period of delinquency, and the enabling legislation for Article IX, Section 7 permits retention of actual costs of collection up to ten percent of the amount of the penalties collected; (5) payments attributable to the general costs of investigation and prosecution of a citizen's unlawful conduct may not be considered "remedial" for purposes of Article IX, Section 7; and (6) penalties assessed pursuant to Chapter 105 of the General Statutes are imposed as a monetary payment for a taxpayer's noncompliance with a mandate of the Revenue Act.

2. **Penalties, Fines, and Forfeitures— monies collected for unauthorized substances tax**

The Court of Appeals did not err by holding that monies collected pursuant to Article 2D of Chapter 105, entitled "Unauthorized Substances Taxes," were not required to be paid to public schools under Article IX, Section 7 of the North Carolina Constitution, because: (1) Article IX, Section 7 applies to the penal laws of the State, meaning those statutes imposing a monetary payment for their violation and which are punitive rather than remedial in nature; and (2) the excise tax on unauthorized substances is not a penalty subject to the provisions of Article IX, Section 7 although penalties collected for late or otherwise improper payments of the unauthorized substances tax are properly classified as penalties to be disbursed to the public school systems pursuant to Article IX, Sextion 7.

3. **Penalties, Fines, and Forfeitures— funds collected by state universities—traffic and parking violations**

The Court of Appeals erred by holding that funds collected by the institutions in the University of North Carolina system for traffic and parking violations pursuant to N.C.G.S. § 116-44.4(h) do not accrue to the Civil Penalty Fund, because: (1) the fact that the University has opted to collect the penalty for violation of the parking and traffic ordinances as civil penalties recoverable in a civil action for indebtedness does not change the nature of the offense committed for which the penalty is imposed; and (2) civil penalties collected pursuant to N.C.G.S. § 116-44.4 are punitive in nature.

**4. Penalties, Fines, and Forfeitures— payments collected at University campuses—loss, damage, or late return of materials from campus libraries**

The Court of Appeals did not err by holding that payments collected by the trustees of each University of North Carolina campus for loss, damage, or late return of materials borrowed from campus libraries are not subject to Article IX, Section 7 of the North Carolina Constitution, because: (1) Article IX, Section 7 applies to the penal laws of the State, meaning those statutes imposing a monetary payment for their violation and which are punitive rather than remedial in nature; (2) the funds received are used exclusively for the costs associated with the replacement of the items lost or damaged by the user; (3) the payment is remedial in nature since the funds are collected to repair harm done by the offending party; and (4) the late fee is in the nature of a user fee designed to manage the collection, as opposed to a penalty.

**5. Penalties, Fines, and Forfeitures— proceeds collected by Department of Transportation—overweight vehicles**

The Court of Appeals did not err by concluding that proceeds of payments collected by the North Carolina Department of Transportation pursuant to N.C.G.S. § 20-118(e) are subject to Article IX, Section 7 of the North Carolina Constitution and belong to the public schools based on the fact that penalties assessed against owners of overweight vehicles are reimbursement for damages or are a tax, because: (1) the fact that a violation is not punishable as a crime does not establish that the penalty is not penal in nature; (2) nothing in the record supports a conclusion that a correlation exists between the graduated scale for the penalties and the cost of repair to the highways; (3) funds deposited in the Highway Fund are used for purposes other than repair and maintenance of roadways damaged by overweight vehicles; (4) our Supreme Court has recognized restitution in the context of Article IX, Section 7 only when the damages were specifically quantified; and (5) these penalties are not a safeguard to protect the State's revenues nor is there evidence that punishment of the owners of overweight vehicles entails extensive investigation or litigation.

**6. Penalties, Fines, and Forfeitures— monies collected by Department of Transportation—lapses in insurance coverage**

The Court of Appeals did not err by holding that monies collected as civil penalties under N.C.G.S. § 20-309(e) by the Department of Transportation for lapses in insurance coverage are subject to Article IX, Section 7 of the North Carolina Constitution and belong to the public schools, because: (1) the fifty dollar civil penalty paid by the owner for lapsed coverage is not voluntary and the purpose of the penalty is to penalize the owner of a vehicle who violates the statutes requiring financial responsibility to cover injury and damage occurring in the operation of an automobile on the highways of North Carolina; and (2) defendants have not shown that the penalty is designed to compensate for particular damages incurred by the State or an individual victim.

**7. Penalties, Fines, and Forfeitures— monies collected by Employment Security Commission—overdue employer contributions, late reports, and returned checks**

The Court of Appeals erred by reversing the trial court's judgment that monies collected by the Employment Security Commission under Chapter 96 of the General Statutes (Employment Security Act) for overdue employer contributions, late reports, and returned checks were subject to Article IX, Section 7 of the North Carolina Constitution, because: (1) the payments are penalties imposed for violation of the statutory requirements; (2) neither defendants nor the Court of Appeals cite to specific language in the statute defining the employer contributions as taxes; (3) the General Assembly has designated each of these payments as a penalty; (4) the statute requires that interest be assessed on all contributions that are paid late, and the interest, which compensates for lost revenues, is tallied separately from any additional penalty that is assessed; (5) interest and penalties collected on late contributions are placed in the Special Employment Security Administration Fund (SESAF), not the Unemployment Insurance Fund, and the SESAF may be used for, among other things, extensions, repairs, enlargements and improvements to buildings, and the enhancement of the work environment in buildings used for Commission business; (6) nothing in the statute suggests that the penalty is in any way remedial or intended to preserve the integrity of the

Unemployment Security Fund, but instead the penalty is assessed in addition to interest to penalize an employer for noncompliance with a statutory mandate; and (7) the threat of a hefty penalty may deter noncompliance, but this deterrence factor does not transform the penalty into a remedial tax.

**8. Penalties, Fines, and Forfeitures— monies collected by state agencies and licensing boards—late renewal of licenses or late payment of license fees**

The Court of Appeals did not err by holding that payments collected by state agencies and licensing boards for the late renewal of licenses or the late payment of licensing fees are not subject to Article IX, Section 7 of the North Carolina Constitution, because: (1) in the statutes under N.C.G.S. §§ 88B-20 and 88B-21, 84-34, 87-44, and 87-22, the use of the term "fee" to describe the payments collected by the Cosmetic Arts Board, the State Bar, the Electrical Contractors Board, and the Plumbing Contractors Board after 6 July 2001 manifests the legislature's intent that these payments be remedial rather than punitive; (2) the penalty is a revocation or suspension of the license and whatever sanctions the statute may authorize for a person's continued practice of the trade or profession during the period of revocation or suspension; (3) the fee, or in the case of plumbing and heating contractors the nonpayment penalty, is an administrative charge to cover the costs of collecting the license fees; and (4) the late fees collected often do not cover the expense incurred in attempting to collect the license fees.

**9. Penalties, Fines, and Forfeitures— payment by environmental violator to fund supplemental environmental project**

The Court of Appeals did not err by affirming the trial court's ruling that payments by an environmental offender to fund a Supplemental Environmental Project (SEP) in lieu of paying a portion of a civil penalty assessed by DENR, including the money paid by the City of Kinston to Lenoir Community College, are subject to Article IX, Section 7 of the North Carolina Constitution, because: (1) the fact that the payment was made to a third party pursuant to a SEP incorporated into a settlement agreement does not change the nature of the payment as punitive; (2) the payment is this case was triggered by an environmental violation for which the General Assembly authorized DENR to punish the violator; (3) the statutory authorization may not be

changed in form by the unilateral action of DENR; and (4) the terms and descriptions DENR and a violator use to refer to a payment are not determinative.

**10. Penalties, Fines, and Forfeitures— civil penalty fund— school technology fund**

The Court of Appeals did not err by holding that the General Assembly's statutory scheme for distribution of monies gathered pursuant to Article IX, Section 7 of the North Carolina Constitution codified in Article 31A of Chapter 115C is constitutional, because: (1) Article IX, Section 7 is not a self-executing provision, and thus, the General Assembly's actions in specifying how the provision's goals are to be implemented must be held to be constitutional unless the statutory scheme runs counter to the plain language of or the purpose behind Article IX, Section 7; (2) Article 31A of Chapter 115C merely specifies details which are omitted from the broad language of Article IX, Section 7; (3) by directing that funds subject to Article IX, Section 7 be remitted to the Civil Penalty Fund and returned to the county school systems, the General Assembly has fully complied with the mandate embodied in the phrase "belong to and remain in the several counties;" and (4) implementation of technology plans in local public school systems is within the purview of the provision's broad mandate.

**11. Penalties, Fines, and Forfeitures— civil penalties paid by public schools—Civil Penalty Fund**

The Court of Appeals erred by holding that civil penalties paid by the State's public school systems should not be paid into the Civil Penalty Fund for distribution back to school systems, because: (1) under the plain language of Article IX, Section 7 of the North Carolina Constitution and the enabling statutes, N.C.G.S. §§ 115C-457.1 through -457.3, monies paid by local public school systems as civil penalties must be remitted to the Civil Penalty Fund for return to all of the public schools in the manner dictated by N.C.G.S. § 115C-457.3; and (2) neither the State Constitution nor the statutory scheme makes any exception for schools which committed wrongdoing.

Appeal by defendants Tippett and Howard pursuant to N.C.G.S. § 7A-30(2) from the decision of a divided panel of the Court of Appeals, 160 N.C. App. 253, 585 S.E.2d 418 (2003), affirming in part and reversing in part an order of summary judgment entered 14

December 2001 by Judge Abraham Penn Jones in Superior Court, Wake County. On 5 February 2004, the Supreme Court allowed discretionary review of additional issues as to all plaintiffs and as to defendants Howard and Ross. Heard in the Supreme Court 11 May 2004.

*Tharrington Smith, L.L.P., by Michael Crowell, and Roberts & Stevens, P.A., by Cynthia Grady; for plaintiff-appellants/ appellees.*

*Roy Cooper, Attorney General, by W. Dale Talbert, Special Deputy Attorney General, for defendant-appellants/appellees Tippett, Howard, and Ross and defendant-appellees Moore, Powell, McCoy, Kirk, Ward, Cooper, Tolson, Broad, Moeser, Fox, Fain, Buell, Lunsford, Goodman, and Van Essen.*

*Young Moore and Henderson, P.A., by John N. Fountain and Reed N. Fountain, for defendant-appellees O'Brien and Brooks.*

*Allen and Pinnix, P.A., by Noel L. Allen, for North Carolina Board of Architecture and North Carolina Board of Funeral Service, amici curiae.*

*Bailey & Dixon, L.L.P., by Carson Carmichael, III, and Anna Baird Choi, for North Carolina Licensing Board for General Contractors and North Carolina Board of Pharmacy, amici curiae.*

PARKER, Justice.

The Court in this appeal considers the proper implementation of the constitutional mandate in Article IX, Section 7 of the North Carolina Constitution, which provides:

> All moneys, stocks, bonds, and other property belonging to a county school fund, and the clear proceeds of all penalties and forfeitures and of all fines collected in the several counties for any breach of the penal laws of the State, shall belong to and remain in the several counties, and shall be faithfully appropriated and used exclusively for maintaining free public schools.

N.C. Const. art. IX, § 7.[1] The specific issues before the Court in this declaratory judgment proceeding are: (i) whether certain monetary

---

1. Article IX, Section 7 was amended effective 1 January 2005. As amended the section now reads:

**N.C. SCHOOL BDS. ASS'N v. MOORE**

[359 N.C. 474 (2005)]

payments to state agencies are being remitted to the State's General Fund or being retained by those agencies in violation of Article IX, Section 7; (ii) whether monies paid by environmental violators to fund, directly or indirectly, Supplemental Environmental Projects in lieu of civil penalties should be subject to Article IX, Section 7; (iii) whether the statutory scheme set out at N.C.G.S. §§ 115C-457.1 through -457.3 violates Article IX, Section 7 of the North Carolina Constitution by directing that the clear proceeds of civil penalties and forfeitures be remitted to the State Civil Penalty and Forfeiture Fund ("Civil Penalty Fund") rather than remain in the several counties where collected and by directing that the funds be used for school technology purposes rather than spent in the discretion of the local board of education of the county where collected; and (iv) whether civil penalties collected from the local school systems themselves are to be returned to the school systems pursuant to Article IX, Section 7.

Plaintiffs, the North Carolina School Boards Association and the school boards from Wake, Durham, Johnston, Buncombe, Edgecombe, and Lenoir Counties, instituted this action on 14 December 1998. On 18 December 2000, plaintiffs moved for summary judgment on all claims. All defendants except defendants O'Brien and Brooks also moved for summary judgment. After a hearing on the respective summary judgment motions, the trial court on 14 December 2001 entered summary judgment for plaintiffs on all issues. The trial court further stayed operation and enforcement of the order pending appeal.

---

Sec. 7. County school fund; State fund for certain moneys.

(a) Except as provided in subsection (b) of this section, all moneys, stocks, bonds, and other property belonging to a county school fund, and the clear proceeds of all penalties and forfeitures and of all fines collected in the several counties for any breach of the penal laws of the State, shall belong to and remain in the several counties, and shall be faithfully appropriated and used exclusively for maintaining free public schools.

(b) The General Assembly may place in a State fund the clear proceeds of all civil penalties, forfeitures, and fines which are collected by State agencies and which belong to the public schools pursuant to subsection (a) of this section. Moneys in such State fund shall be faithfully appropriated by the General Assembly, on a per pupil basis, to the counties, to be used exclusively for maintaining free public schools.

Act of July 18, 2003, ch. 423, sec. 1, 2003 N.C. Sess. Laws 1284, 1284. The amendment does not, however, apply to this litigation instituted on 14 December 1998. *Smith v. Mercer*, 276 N.C. 329, 337-38, 172 S.E.2d 489, 494-95 (1970).

Defendants filed timely notice of appeal from the trial court's order. On 16 September 2003, the Court of Appeals issued an opinion affirming in part and reversing in part the trial court's order. *N.C. Sch. Bds. Ass'n v. Moore*, 160 N.C. App. 253, 585 S.E.2d 418 (2003). The Court of Appeals' opinion may be broken down into five discrete sections. The Court of Appeals first reversed the trial court's conclusion that the General Assembly's plan prescribed in N.C.G.S. §§ 115C-457.1 through -457.3 for distributing the money collected pursuant to Article IX, Section 7 is unconstitutional. *Id.* at 266, 585 S.E.2d at 427. The Court of Appeals noted that Article IX, Section 7 is not self-executing and requires legislation to provide for its enforcement. *Id.* at 265, 585 S.E.2d at 426. Thus, the Court of Appeals held that the "General Assembly, by enacting Article 31A of Chapter 115C, has properly legislated the details necessary to effectuate the general proposition laid down by Article IX, Section 7 that the clear proceeds of civil penalties be set aside and used exclusively for the support of our State's public schools" and that the provisions of the statutes were in keeping with the framers' intent manifested by Article IX, Section 7. *Id.* at 266, 585 S.E.2d at 427.

The Court of Appeals next considered the trial court's ruling that all the payments to state agencies referenced in plaintiffs' complaint are to be distributed to the public schools pursuant to Article IX, Section 7. The Court of Appeals affirmed the trial court's ruling with respect to the following payments: (i) payments collected by the Department of Transportation from owners of overweight vehicles pursuant to N.C.G.S. § 20-118, and (ii) payments collected by the Department of Transportation for lapses in insurance coverage pursuant to N.C.G.S. § 20-309. *Id.* at 268-70, 585 S.E.2d at 428-30. The Court of Appeals reversed the trial court's holding that the following payments are subject to Article IX, Section 7: (i) payments collected by the Department of Revenue for failure to comply with regulatory or statutory tax provisions pursuant to N.C.G.S. §§ 105-113.89, -163.15, -163.41, -164.14, -231, and -236; (ii) payments collected by the Employment Security Commission from employers for overdue contributions to the unemployment insurance fund, late filing of wage reports, and tendering a worthless check pursuant to N.C.G.S. § 96-10(a), (g), and (h); (iii) payments collected by the boards of trustees of the Consolidated University of North Carolina campuses for violation of ordinances regulating traffic, parking, and vehicle registration pursuant to N.C.G.S. § 116-44.4(h); (iv) payments collected by the boards of trustees of the Consolidated University of North

Carolina campuses for loss, damage, or late return of materials borrowed from university libraries pursuant to N.C.G.S. § 116-33; (v) payments collected by the Department of Revenue from persons dealing in unauthorized substances pursuant to N.C.G.S. §§ 105-113.105 through -113.113; and (vi) payments collected by state agencies and licensing boards for licensees' failure to comply in a timely manner with licensing requirements pursuant to N.C.G.S. §§ 87-22, 87-44, 88B-6 and -21, and 84-34. *Id.* at 270-78, 282-83, 585 S.E.2d at 430-34, 437. In making these determinations, the Court of Appeals followed this Court's precedent by employing an analysis which classifies each of these payments as either punitive, in which case the payment accrues to the public schools under Article IX, Section 7, or remedial, in which case it remains under the dominion of the collecting agency. *Id.* at 266-68, 585 S.E.2d at 427-28.

The Court of Appeals also considered whether monies paid by an environmental violator to perform or to fund a third party's performance of a Supplemental Environmental Project ("SEP") in lieu of paying a civil penalty to the Department of Environment and Natural Resources ("DENR") pursuant to N.C.G.S. §§ 143-215.6A, -215.114A, and -215.3(a)(9) were subject to Article IX, Section 7. *Id.* at 278-81, 585 S.E.2d at 434-36. The Court of Appeals analyzed this issue in light of this Court's precedent in *Craven Cty. Bd. of Educ. v. Boyles*, 343 N.C. 87, 468 S.E.2d 50 (1996), in which we held that an environmental violator's payments pursuant to a settlement agreement subsequent to a civil penalty assessment by the Department of Environment, Health and Natural Resources were subject to Article IX, Section 7. The Court of Appeals held that "payments by an environmental violator, including [a specific violator for whom payments are in question], to support a SEP as part of a settlement agreement are 'still paid because of a civil penalty assessed against the [environmental violator]' and as such are punitive in nature and therefore subject to Article IX, Section 7." *N.C. Sch. Bds. Ass'n*, 160 N.C. App. at 280, 585 S.E.2d at 435 (quoting *Craven Cty. Bd. of Educ.*, 343 N.C. at 91, 468 S.E.2d at 52).

Next, the Court of Appeals turned to the question of civil penalties paid by local public school systems to state agencies. Acknowledging the trial court's holding that these payments are within the clear purview of Article IX, Section 7, the Court of Appeals nevertheless held that monies raised from school systems' own penalties should not be returned to those same school systems. *Id.* at 281-82, 585 S.E.2d at 436-37. The Court of Appeals reasoned that were

the schools permitted to utilize the funds remitted by them as civil penalties, "the offending unit will receive back from the School Technology Fund a portion of the fine or penalty assessed against the unit." *Id.* at 282, 585 S.E.2d at 436. The Court of Appeals concluded that such a reversion violated the public policy of this State that a malfeasor not be permitted to benefit from his own bad acts. *Id.* As a result the Court of Appeals held that money paid by the schools as civil penalties should remain with the collecting State agency. *Id.*

Finally, the Court of Appeals considered the trial court's conclusion that the three-year statute of limitations in N.C.G.S. § 1-52 should apply to plaintiffs' claims. *Id.* at 283-84, 585 S.E.2d at 437-38. Defendants contended that this case is governed by N.C.G.S. § 1-54(2), which provides for a one-year statute of limitations. The Court of Appeals reasoned that, although appellate courts have held that section 1-54(2) applies to actions to collect civil penalties and forfeitures, this action is not to collect unpaid penalties but instead to recover for public schools the penalties already collected by the various State agencies. *Id.* at 284, 585 S.E.2d at 438. The Court of Appeals affirmed the trial court on this issue, holding that "the trial court correctly applied the three-year limitations period provided in N.C. Gen. Stat. § 1-52 (2001) for 'an action . . . [u]pon a liability created by statute' or '[a]gainst a public officer, for a trespass, under color of his office.' " *Id.* (quoting N.C.G.S. § 1-52 (2001)).

The dissenting judge in the Court of Appeals concluded that payments collected by the Department of Transportation pursuant to N.C.G.S. § 20-118(e) from owners of vehicles which exceed axle-weight limits are not within the purview of Article IX, Section 7 and should remain with the collecting agency. *Id.* at 285, 585 S.E.2d at 438. The dissenting judge concurred with the majority's analysis classifying payments as remedial or punitive, but would have held that "[t]he weight penalties collected pursuant to N.C. Gen. Stat. § 20-118(e) are remedial in nature and, therefore, do not belong to the public schools" on the basis that they are "intended to compensate the state for the deterioration of its highways due to operation of overweight vehicles thereon and are thus remedial in nature." *Id.* at 286, 585 S.E.2d at 439.

The dissenting judge also opined that penalties paid by local school boards to state agencies should be remitted to the Civil Penalty Fund pursuant to Article IX, Section 7. *Id.* at 287, 585 S.E.2d at 440. The dissenting judge would apply the same case-by-case remedial/punitive analysis to payments made by school systems as to

payments by other persons or entities. *Id.* at 288, 585 S.E.2d at 440. However, the dissenter would exclude the offending school system from the distribution of the funds received as a result of the system's wrongdoing. *Id.* at 288-89, 585 S.E.2d at 440-41.

We note initially that defendants did not petition for review of the Court of Appeals' determination that plaintiffs' claims will be subject to a three-year statute of limitations. Thus, under the Rules of Appellate Procedure, defendants have abandoned the assignment of error relative to the proper statute of limitations, and this Court will not consider it. N.C. R. App. P. 28(a).

## I. Law Governing Proper Disposition of Payments Made to State Agencies and Claimed by Plaintiffs

Plaintiffs and defendants each except to certain determinations by the Court of Appeals that payments made to the various state agencies do or do not fall within the purview of Article IX, Section 7. All parties agree as to the basic precedent which governs this Court's consideration of these payments. The parties' arguments, however, diverge on how this precedent should be applied in this case. Plaintiffs argue that the precedents hold that any civil penalties paid for violation of a penal law of the State and accruing to the State are necessarily punitive and must be paid to the public schools. Defendants, on the other hand, argue that any penalty paid to the State to compensate it for an injury, damage, or loss above normal operating costs falls outside the scope of Article IX, Section 7.

In *Mussallam v. Mussallam*, 321 N.C. 504, 364 S.E.2d 364 (1988), an action to recover the proceeds of a civil appearance bond which had been forfeited, this Court interpreted Article IX, Section 7 as providing two categories of monies. In *Mussallam* the Court stated:

> These are (1) the clear proceeds of all penalties and forfeitures in all cases, regardless of their nature, so long as they accrue to the state; and (2) the clear proceeds of all fines collected for any breach of the criminal laws. In the second category, it is quite apparent from the words of section 7 that the clear proceeds of all fines collected for the violation of the criminal laws are to be used for school purposes. One could not legitimately argue that the violation of a criminal law is not a "breach of the penal laws." While its intent as to the first category is less obvious, the wording of the entire section 7 makes its meaning clear. The term "penal laws," as used in the context of article IX, section 7, means

laws that impose a monetary payment for their violation. The payment is punitive rather than remedial in nature and is intended to penalize the wrongdoer rather than compensate a particular party. *See* D. Lawrence, *Fines, Penalties, and Forfeitures: An Historical and Comparative Analysis*, 65 N.C.L. Rev. 49, 82 (1986). Thus, in the first category, the monetary payments are penal in nature and accrue to the state regardless of whether the legislation labels the payment a penalty, forfeiture or fine or whether the proceeding is civil or criminal.

*Id.* at 509, 364 S.E.2d at 366-67. The Court then held that the purpose of the forfeiture was to punish the defendant if he did not appear in court and noted that the bond specifically made its proceeds payable to the State of North Carolina. *Id.* at 509, 364 S.E.2d at 367. Thus, the Court held that the bond fell within the scope of the first category. *Id.* Citing *Katzenstein v. Raleigh & Gaston R.R. Co.*, 84 N.C. 688 (1881), and *State ex rel. Hodge v. Marietta & N. Ga. R.R.*, 108 N.C. 17, 108 N.C. 24, 12 S.E. 1041 (1891), the Court rejected the plaintiff's argument that the proceeds were payable to her, saying, "the distinction lies in the nature of the penalty or forfeiture, i.e., whether it was designed to penalize the wrongdoer or to compensate a particular party." *Id.* at 510, 364 S.E.2d at 367.

In *State ex rel. Thornburg v. House & Lot*, 334 N.C. 290, 432 S.E.2d 684 (1993), an action involving the proceeds of the sale of a house forfeited pursuant to Chapter 75D of the General Statutes, the State's Racketeer Influenced and Corrupt Organizations ("RICO") Act, this Court explained the Court's reliance on *Hodge* and *Katzenstein* in *Mussallam*. The Court noted that in *Katzenstein* this Court concluded that the constitutional provision applied only to penalties and forfeitures that accrued to the State; thus, plaintiff, a private company, could sue and recover for violation of the statute in question because that right was given by the statute to " 'any person suing for the same.' " *Id.* at 295, 432 S.E.2d at 687 (quoting *Katzenstein*, 84 N.C. at 689). In *Hodge*, however, the statute specifically required the penalty " 'be sued for in the name of the State of North Carolina.' " *Id.* (quoting *Hodge*, 108 N.C. at 18, 108 N.C. at 25, 12 S.E. at 1041). The Court concluded that "[t]he RICO Act provides that the proceeds from the sale of RICO forfeited property accrue to the State. Such proceeds must therefore be paid to the public school fund." *Id.* The Court noted that while alternative dispositions of forfeited property were permitted under the RICO Act, the Act "in every instance, requir[ed] that the proceeds of any sale of such property

'shall be paid to the State Treasurer.' §§ 75D-5(j)(1-7)." *Id.* at 294, 432 S.E.2d at 686.

Although this Court has said in previous cases that the label attached to the money is not controlling, *Cauble v. City of Asheville*, 301 N.C. 340, 271 S.E.2d 258 (1980); *State v. Rumfelt*, 241 N.C. 375, 85 S.E.2d 398 (1955); *Cty. Bd. of Sch. Dirs. v. City of Asheville*, 128 N.C. 185, 128 N.C. 249, 38 S.E. 874 (1901), and *Bd. of Educ. v. Town of Henderson*, 126 N.C. 439, 126 N.C. 689, 36 S.E. 158 (1900), this language arose in the determination of whether a particular assessment was a "fine" or a "penalty," usually in the context of a municipal ordinance that had been declared by statute a violation of the state's penal laws. In *Town of Henderson* the Court said:

A "fine" is the sentence pronounced by the court for a violation of the criminal law of the State; while a "penalty" is the amount recovered—the penalty prescribed for a violation of the statute law of the State or the ordinance of a town. This penalty is recovered in a civil action of debt.

126 N.C. at 440, 126 N.C. at 691, 36 S.E. at 159. Then in *City of Asheville*, the Court, utilizing the law explicated in *Town of Henderson*, held that Article IX, Section 5 (now 7) applied

also to "penalties," the collection of which is enforceable by proceedings before a Justice of the Peace or municipal officers empowered by law to enforce the collection of such penalty in a criminal action under section 3820 of The Code, for, in such cases, though the word "penalty" is used, it is really a "fine."

128 N.C. at 187, 128 N.C. at 251, 38 S.E. at 875. In *Shore v. Edmisten*, 290 N.C. 628, 227 S.E.2d 553 (1976), the Court, in determining whether money payments imposed by a trial judge as a condition of probation were fines or restitution, said, "In determining whether a given payment is a fine or restitution, the label given by the judge (or the legislature) is not determinative." *Id.* at 633, 227 S.E.2d at 558. The Court explained that "[a] state or a local agency can be the recipient of restitution where the offense charged results in particular damage or loss to it over and above its normal operating costs." *Id.* at 633-34, 227 S.E.2d at 559. The Court specifically held that a suspended sentence could not be conditioned on payment of money for continued law enforcement. *Id.* at 638-39, 227 S.E.2d at 562. As the Court further noted, the trial court must identify whether the payment is restitution, and a showing must be made that the money

is to compensate an aggrieved party for damages suffered; otherwise, the payment is subject to Article IX, Section 7. *Id.* at 633-34, 227 S.E.2d at 559.

We do not, however, understand these rulings, that the label affixed by either a legislative body or the judge is not determinative, to undermine or negate the canons of construction. In matters of statutory construction the task of the Court is to determine the legislative intent, and the intent is ascertained in the first instance "from the plain words of the statute." *Elec. Supply Co. v. Swain Elec. Co.*, 328 N.C. 651, 656, 403 S.E.2d 291, 294 (1991). The words used to describe the payment are, thus, to be considered in deciding whether the payment made on account of a violation comes within the purview of Article IX, Section 7.

In the instant case, all the payments in question fall into the first category identified in *Mussallam*. Thus, the determinative question under *Mussallam* is whether the "civil penalty" is punitive or remedial in nature. The word "remedial" means "affording a remedy." *Black's Law Dictionary* 1293 (6th ed. 1990). The critical issue is whether the penalty mandated for violation of the statute is imposed as punishment to deter noncompliance or to measure the damages accruing to an individual or class of individuals resulting from the breach. *Id.* at 1294. This determination can only be made by examining each of the statutory penalties challenged in plaintiffs' complaint.

## II. Monies Collected by the Department of Revenue for Late Filings, Underpayments, and Failure to Comply with Statutory or Regulatory Tax Provisions

[1] Plaintiffs assert that the Court of Appeals erred in holding that payments collected by the Department of Revenue under N.C.G.S. §§ 105-113.89, -163.8, -163.15, -163.41, and -236 for late filings, underpayments, and failure to comply with various provisions of the North Carolina Revenue Act were not subject to Article IX, Section 7. We agree.

The Court of Appeals relied on federal case law which, in the context of the Fifth Amendment Double Jeopardy Clause or the Eighth Amendment Excessive Fines Clause, determined that additions to tax under the Internal Revenue Code were remedial in nature in that " '[t]hey are provided primarily as a safeguard for the protection of the revenue and to reimburse the Government for the heavy expense of investigation and the loss resulting from the taxpayer's fraud.' "

*N.C. Sch. Bds. Ass'n,* 160 N.C. App. at 271, 585 S.E.2d at 430 (quoting *Helvering v. Mitchell,* 303 U.S. 391, 401, 82 L. Ed. 917, 923 (1938)).[2]

The Court of Appeals' reliance on *Mitchell* is misplaced. Interpretation of our state statutes is not governed by the interpretation of a federal statute by a federal court. *Sharpe v. Park Newspapers of Lumberton, Inc.,* 317 N.C. 579, 584, 347 S.E.2d 25, 29 (1986); *Worthington v. Bynum,* 305 N.C. 478, 485, 290 S.E.2d 599, 604 (1982). Although the label used in a statute does not determine whether the payment is a penalty within the meaning of the constitution, in discerning the intent of the General Assembly, we look first to the "plain words of the statute." *Elec. Supply Co.,* 328 N.C. at 656, 403 S.E.2d at 294. The payments claimed by plaintiffs under Chapter 105 are denominated "penalties" and are imposed for the taxpayer's failure to file a return or pay a tax as required by the statute. The statutes provide as follows:

> N.C.G.S. § 105-163.8(a) (2003): "A withholding agent who fails to withhold the amount of income taxes required by this Article or who fails to pay withheld taxes by the due date for paying the taxes is subject to the penalties provided in Article 9 of this Chapter."

> N.C.G.S. § 105-163.15(a) (2003): "In the case of any underpayment of the estimated tax by an individual, the Secretary shall assess a penalty in an amount determined by applying the applicable annual rate established under G.S. 105-241.1(i) to the amount of the underpayment for the period of the underpayment."

> N.C.G.S. § 105-163.41(a) (2003): "Except as provided in subsection (d), if the amount of estimated tax paid by a corporation during the taxable year is less than the amount of tax imposed upon the corporation under Article 4 of this Chapter for the taxable year, the corporation must be assessed an additional tax as a penalty in an amount determined . . . ."

> N.C.G.S. § 105-236 (2003): "Penalties assessed by the Secretary under this Subchapter are assessed as an additional tax. Except as otherwise provided by law, and subject to the provisions of G.S. 105-237, the following penalties shall be applicable:

> . . . .

---

2. Inadvertently called *Helvering v. Mountain Producers Corp.,* though citing to *Helvering v. Mitchell.*

"(3) Failure to File Return.—In case of failure to file any return on the date it is due, determined with regard to any extension of time for filing, the Secretary shall assess a penalty equal to five percent (5%) of the amount of the tax if the failure is for not more than one month, with an additional five percent (5%) for each additional month, or fraction thereof, during which the failure continues, not exceeding twenty-five percent (25%) in the aggregate, or five dollars ($5.00), whichever is the greater.

"(4) Failure to Pay Tax When Due.—In the case of failure to pay any tax when due, without intent to evade the tax, the Secretary shall assess a penalty equal to ten percent (10%) of the tax, except that the penalty shall in no event be less than five dollars ($5.00). . . .

"(5) Negligence.—

    a. Finding of negligence.—For negligent failure to comply with any of the provisions to which this Article applies, or rules issued pursuant thereto, without intent to defraud, the Secretary shall assess a penalty equal to ten percent (10%) of the deficiency due to the negligence.

    . . . .

"(6) Fraud.—If there is a deficiency or delinquency in payment of any tax because of fraud with intent to evade the tax, the Secretary shall assess a penalty equal to fifty percent (50%) of the total deficiency."

Defendants contend that the Court of Appeals was correct in its analysis and emphasize that the penalties under N.C.G.S. § 105-236 are "assessed as an additional tax" and that the definitions section of the Revenue Act states that "[u]nless the context clearly requires otherwise, the terms 'tax' and 'additional tax' include penalties and interest as well as the principal amount." N.C.G.S. § 105-228.90(b)(7) (2003). Defendants cite numerous federal cases which relied on *Helvering v. Mitchell* and urge this Court to adopt the remedial analysis in *Mitchell*. We are not persuaded, however, that the collection of the penalty as an additional tax is determinative that the penalty is remedial. N.C.G.S. § 105-241.1 provides:

    (a) Proposed Assessment.—If the Secretary discovers that any tax is due from a taxpayer, the Secretary must notify the tax-

payer in writing of the kind and amount of tax due and of the Secretary's intent to assess the taxpayer for the tax. The notice must describe the basis for the proposed assessment and identify the amounts of any tax, interest, additions to tax, and penalties included in the proposed assessment.

. . . .

(i) Interest.—All assessments of tax, exclusive of penalties assessed on the tax, shall bear interest at the rate established pursuant to this subsection from the time the tax was due until paid.

Thus, the principal tax, interest, and penalties are treated discretely, and, as with interest, "it is only for purposes of assessment, collection and payment that [penalties] should be treated in the same manner as taxes." *Holt v. Lynch*, 307 N.C. 234, 239, 297 S.E.2d 594, 597 (1982).

Defendants' argument, implicit in its reliance on *Mitchell*, that the penalties are to safeguard the revenue and to reimburse the government for the expense of investigating noncompliance with the revenue laws of the State must also fail. The purpose of interest on deficient or delinquent tax payments is to reimburse for loss of use of the money during the period of delinquency. Further, the enabling legislation for Article IX, Section 7, permits retention of actual costs of collection up to ten percent (10%) of the amount of the penalties collected. N.C.G.S. § 115C-457.2 (2003). Finally, in *Shore v. Edmisten*, this Court held that payments attributable to the general costs of investigation and prosecution of a citizen's unlawful conduct may not be considered "remedial" for purposes of Article IX, Section 7. The Court stated that

[a] state or a local agency can be the recipient of restitution where the offense charged results in particular damage or loss to it over and above its normal operating costs. . . . It would not however be reasonable to require the defendant to pay the State's overhead attributable to the normal costs of prosecuting him.

290 N.C. at 633-34, 227 S.E.2d at 559 (citations omitted).

Based on the foregoing, we conclude that the penalties assessed pursuant to Chapter 105 of the General Statutes are imposed as a monetary payment for a taxpayer's noncompliance with a mandate of the Revenue Act and that under this Court's decision in *Mussallam*, they are subject to Article IX, Section 7.

III.  Monies Collected by the Secretary of Revenue under the State
Unauthorized Substances Excise Tax

[2]  Plaintiffs contend that the Court of Appeals erred in holding that
monies collected pursuant to Article 2D of Chapter 105, entitled
"Unauthorized Substances Taxes," were not required to be paid to
public schools under Article IX, Section 7. The unauthorized sub-
stances tax is an excise tax on certain substances, including con-
trolled substances and illicit spiritous liquor possessed by dealers.
N.C.G.S. § 105-113.107 (2003). One definition of "dealer" is someone
who "actually or constructively possesses more than 42.5 grams of
marijuana, seven or more grams of any other controlled substance
that is sold by weight, or 10 or more dosage units of any other con-
trolled substance that is not sold by weight." Id. § 105-113.106(3)(a).
(2003). The tax rate varies with the substance and ranges from forty
cents for each gram of harvested marijuana to two hundred dollars
for each gram of any controlled substance other than marijuana or
cocaine that is sold by weight. Id. § 105-113.107(a)(1), (2). Dealers
are required to pay the amount due under the statute within forty-
eight hours after receipt of the substance. Id. § 105-113.109 (2003).
After payment the dealer is issued a revenue stamp to be affixed to
the substance to show that the tax has been paid. Id. § 105-113.108(a)
(2003). Dealers are not required to give their name, address, social
security number, or other identifying information. Id. Information
obtained in collecting the unauthorized substances tax is confidential
and may not be disclosed or used in a criminal prosecution, except
for prosecution for violation of Article 2D of Chapter 105. N.C.G.S.
§ 105-113.112 (2003). "Once the tax due on an unauthorized sub-
stance has been paid, no additional tax is due under [Article 2D] even
though the unauthorized substance may be handled by other dealers."
Id. § 105-113.109. The statute also permits the Secretary of Revenue
to impose any applicable penalties and interest authorized by Article
9 of Chapter 105 on any person who fails to timely pay the unautho-
rized substance excise tax. N.C.G.S. § 105-113.110A (2003).

Plaintiffs argue that, when considered in light of this Court's con-
struction of the term "penal laws" in Mussallam, the tax is a penalty
for purposes of Article IX, Section 7. Plaintiffs also contend that the
criteria set forth in Dep't of Revenue v. Kurth Ranch, 511 U.S. 767,
128 L. Ed. 2d 767 (1994), and applied in Lynn v. West, 134 F.3d 582
(4th Cir.), cert. denied, 525 U.S. 813, 142 L. Ed. 2d 36 (1998), should
be applied in determining whether the tax is more in the nature of a
penalty. We disagree.

The section titled "Purpose" in Article 2D states:

The purpose of this Article is to levy an excise tax to generate revenue for State and local law enforcement agencies and for the General Fund. Nothing in this Article may in any manner provide immunity from criminal prosecution for a person who possesses an illegal substance.

N.C.G.S. § 105-113.105 (2003).

In a previous decision construing the predecessor statute, the North Carolina Controlled Substance Tax, N.C.G.S. §§ 105-113.105 through -113.113 (1992), which contained the same essential provisions as the current statute, this Court affirmed the opinion of the Court of Appeals, which held that the same excise tax at issue in this case was not a penalty and collection of the tax did not bar subsequent prosecution under the Double Jeopardy Clause of the United States Constitution or the Law of the Land Clause of the North Carolina Constitution. *State v. Ballenger*, 123 N.C. App. 179, 472 S.E.2d 572 (1996), *aff'd per curiam*, 345 N.C. 626, 481 S.E.2d 84, *cert. denied*, 522 U.S. 817, 139 L. Ed. 2d 29 (1997). In *Ballenger*, the Court of Appeals analyzed the provisions of Chapter 105, Article 2D in light of the factors enunciated in *Kurth Ranch* and noted that the North Carolina tax did not have either of the "unusual features" which the Supreme Court considered significant in concluding that the Montana tax on dangerous drugs constituted punishment for double jeopardy purposes. *Id.* at 183, 472 S.E.2d at 574. Specifically, the North Carolina tax does not require that the person in possession of the substances be arrested, "nor is [the tax] assessed on property that necessarily has been confiscated or destroyed." *Id.* The Court of Appeals concluded that "the North Carolina statute is a legitimate and remedial effort to recover revenue from those persons who would otherwise escape taxation when engaging in the highly profitable, but illicit and sometimes deadly activity of possessing, delivering, selling or manufacturing large quantities of controlled drugs." *Id.* at 184, 472 S.E.2d at 575. Today we reaffirm this holding as it applies to the North Carolina Unauthorized Substances Taxes law.

Plaintiffs are correct that Article IX, Section 7 applies to both civil and criminal penalties. However, the test is whether the tax is "intended to penalize the wrongdoer rather than compensate a particular party." *Mussallam*, 321 N.C. at 509, 364 S.E.2d at 367. Applying the test established in *Mussallam*, we hold that the excise tax on unauthorized substances is not a penalty subject to the provisions of

Article IX, Section 7 and affirm the decision of the Court of Appeals on this issue.

We do note, however, that the unauthorized substances tax is subject to the same penalties and interest payments as applied to other taxes collected by the Department of Revenue. N.C.G.S. § 105-113.110A. Thus, penalties collected for late or otherwise improper payments of the unauthorized substances tax must be treated in the same manner as penalties discussed in Section II of this opinion. Such payments are properly classified as penalties to be disbursed to public school systems pursuant to Article IX, Section 7.

### IV. Monies Collected by the Board of Trustees of the Consolidated University of North Carolina Campuses for Violation of Ordinances Adopted by the Trustees for the Regulation of Traffic and Parking and the Registration of Vehicles

[3] Plaintiffs next contend that the Court of Appeals erred in holding that the funds collected by the institutions in the University of North Carolina system for traffic and parking violations pursuant to N.C.G.S. § 116-44.4(h) do not accrue to the Civil Penalty Fund. We agree.

The North Carolina Constitution provides that the General Assembly "may enact laws necessary and expedient for the maintenance and management of The University of North Carolina and the other public institutions of higher education." N.C. Const. art. IX, § 8. The General Assembly has enacted section 116-44.4, which allows the board of trustees for each of the sixteen constituent universities of the University of North Carolina system to adopt ordinances to regulate parking and traffic on university property. The statute provides two alternative mechanisms which trustees may select for the enforcement of the ordinances enacted under the statute: (i) violation of an ordinance is by default "an infraction as defined in G.S. 14-3.1 and is punishable by a [monetary] penalty," N.C.G.S. § 116-44.4(g) (2003); or (ii) boards of trustees may explicitly provide that the violation of an ordinance "subjects the offender to a civil penalty" which may be collected "by civil action in the nature of debt," *Id.* § 116-44.4(h) (2003). All parties agree that the monies collected under the first of these two categories are subject to Article IX, Section 7; the only issue for consideration here is the disposition of the proceeds of the "civil penalties" collected pursuant to the latter procedure.

**N.C. SCHOOL BDS. ASS'N v. MOORE**

[359 N.C. 474 (2005)]

Citing section 116-44.4(m), which directs that monies collected under the statute be placed in a trust fund for certain specified uses related to parking, traffic, and transportation on university property, the Court of Appeals held that the civil penalties authorized by section 116-44.4(h) were intended for remedial uses rather than to penalize individuals violating university parking and traffic ordinances. *N.C. Sch. Bds. Ass'n*, 160 N.C. App. at 274-75, 585 S.E.2d at 432. The Court of Appeals further held that section 116-44.4 was constitutional inasmuch as it was enacted pursuant to a constitutional grant of authority under Article IX, Section 8, a co-equal provision with Article IX, Section 7. *Id.* at 275, 585 S.E.2d at 432.

Defendants contend that the payments collected by the constituent institutions for violation of parking, traffic, and vehicle registration ordinances are not civil penalties collected for breach of the State's penal laws and, therefore, do not belong to the public schools pursuant to Article IX, Section 7. Defendants concede that penalties collected as an infraction pursuant to N.C.G.S. § 116-44.4(g) would come within the purview of Article IX, Section 7, and defendants acknowledge that civil penalties that are punitive in nature, that is, intended to punish the violator, go to the public schools. Defendants assert, however, that the civil penalties collected pursuant to N.C.G.S. § 116-44.4(h) for these same violations are remedial in that they are imposed to compensate the institutions as aggrieved parties. The underlying premise of defendants' argument is that the institutions are injured in the form of lost revenue for which the civil penalties partially compensate and that the statutory restrictions on the use of the civil penalties collected under N.C.G.S. § 116-44.4(h) confirm that the character of these penalties is remedial.

In an analogous case involving parking meter violations which the City of Asheville permitted the offender to pay voluntarily, though being subject to criminal prosecution if not paid, the City claimed that the voluntary payments were civil penalties, not fines, and, thus, belonged to the City, not the public schools. *Cauble v. City of Asheville*, 301 N.C. 340, 342, 271 S.E.2d 258, 259 (1980). In distinguishing between fines and civil penalties, this Court stated:

[W]e have often stated that the label attached to the money does not control. Neither does the heart of the distinction rest in whether there has been an actual criminal prosecution resulting in a "sentence pronounced by the court." The crux of the distinction lies in the *nature* of the *offense* committed, and not in the

*method* employed by the municipality to collect fines for commission of the offense.

*Id.* at 344, 271 S.E.2d at 260 (citations omitted). The fact that the University has opted to collect the penalty for violation of the parking and traffic ordinances as civil penalties recoverable in a civil action for indebtedness does not change the nature of the offense committed for which the penalty is imposed. Notwithstanding defendants' protestations to the contrary, the gist of defendants' contention is that the intended use of the payments pursuant to N.C.G.S. § 116-44.4(m) renders them remedial, not punitive. Defendants are correct that this Court has not explicitly stated that the intended use of the payments cannot be considered in determining whether the payment is remedial, but this analysis is not required when the determinative factor is whether the purpose of the civil penalty is punitive in nature or is intended to compensate a party for its loss. *Mussallam,* 321 N.C. at 509, 364 S.E.2d at 367.

In the instant case, the conclusion is inescapable that the penalty imposed is to deter future violations and to extract retribution from the violator for illegally parking, failing to obtain a registration decal, or violating some other traffic ordinance designed to regulate and monitor the flow of traffic on the University campuses.

Defendants urge this Court to accept the analysis recognized by the United States Supreme Court in *United States v. Halper,* 490 U.S. 435, 104 L. Ed. 2d 487 (1989), *overruled in part by Hudson v. United States,* 522 U.S. 93, 139 L. Ed. 2d 450 (1997), in determining whether a civil penalty assessed under a federal statute was remedial or punitive for purposes of the Double Jeopardy Clause's prohibition against punishment twice for the same offense. In *Halper* the United States Supreme Court considered whether the amount of the civil penalty bore a rational relationship to the actual damages sustained by the government and acknowledged that rough justice, not absolute precision, was sufficient in evaluating the amount of damages so long as the amount of the penalty was not severely disproportionate. *Id.* at 449-50, 104 L. Ed. 2d at 502-03. As noted earlier, however, this Court has held that limitations exist as to the purposes for which monies may be used and still be considered "remedial." In *Shore v. Edmisten,* in analyzing whether payments made to the State by criminal defendants were punitive or remedial, we stated that a defendant may not be required "to pay the State's overhead attributable to the normal costs of prosecuting him." 290 N.C. at 634, 227 S.E.2d at 559. *See also Cauble v. City of Asheville,* 314 N.C. 598, 606, 336 S.E.2d 59, 64

(1985). Here, the purposes authorized for the parking penalties under section 116-44.4(m), with the possible exception of subdivision (1), are not legitimate "remedial" purposes under our Article IX, Section 7 analysis. Subdivision (1) of N.C.G.S. § 116.44.4(m) "[t]o defray the cost of administering and enforcing ordinances adopted under this Part," could be a legitimate remedial purpose, but in this situation this use is not sufficient to declare the payment remedial in that this purpose is already accounted for in the definition of "clear proceeds" under § 115C-457.2. The "actual costs of collection" up to ten percent of the total amount collected may be deducted from the funds received. N.C.G.S. § 115C-457.2. Accordingly, we hold that "civil penalties" collected pursuant to N.C.G.S.§ 116-44.4(h) are punitive in nature and must be remitted by the University system to the Civil Penalty Fund.

Finally, we note with respect to the Court of Appeals' discussion of the applicability of Article IX, Section 8, that plaintiffs have not challenged the constitutionality of N.C.G.S. § 116-44.4, but merely the disposition of penalties collected under N.C.G.S. § 116-44.4(h) into a trust account under N.C.G.S. § 116-44.4(m). The authority of the constituent campus boards of trustees to enact ordinances and to charge fees for parking, registration, bus rides, and any other transportation-related services is not in question. What is in question are civil penalties collected under N.C.G.S. § 116-44.4(h), and they belong to the public schools under Article IX, Section 7. Accordingly, the Court of Appeals' decision on this issue is reversed.

V.  Monies Collected by the Boards of Trustees of the Consolidated University of North Carolina Campuses for Loss, Damage, or Late Return of Materials Borrowed from University Libraries.

[4] Plaintiffs assert that the Court of Appeals erred in holding that payments collected by the trustees of each University campus for loss, damage, or late return of materials borrowed from campus libraries are not subject to Article IX, Section 7. Section 116-1(b) of the North Carolina General Statutes, under the heading "Purpose," sets out the mission of the University and states: "[t]hat mission is to discover, create, transmit, and apply knowledge to address the needs of individuals and society . . . . Teaching and learning constitute the primary service that the university renders to society. Teaching, or instruction, is the primary responsibility of each of the constituent institutions." N.C.G.S. § 116-1(b) (2003). To assist in achieving this mission, N.C.G.S. § 116-33 directs that

[e]ach board of trustees shall promote the sound development of the institution within the functions prescribed for it, helping it to serve the State in a way that will complement the activities of the other institutions and aiding it to perform at a high level of excellence in every area of endeavor.

This broad grant of authority enables the board of trustees to establish and maintain a library collection, an integral and necessary asset in the achievement of the University's mission.

The Court of Appeals held that this fee was not subject to Article IX, Section 7 for two reasons. *N.C. Sch. Bds. Ass'n*, 160 N.C. App. at 275-76, 585 S.E.2d at 432-33. First, the Court of Appeals determined that the fee was primarily remedial in nature. *Id.* at 276, 585 S.E.2d at 433. Second, the Court of Appeals held that the statute was passed pursuant to Article IX, Section 9 of the North Carolina Constitution, which mandates that the General Assembly provide higher education to North Carolina citizens "as far as practicable . . . free of expense," N.C. Const. art. IX, § 9. *Id.* Since this provision is separate from and co-equal to Article IX, Section 7, the Court of Appeals reasoned that a statute passed pursuant to Article IX, Section 9 would not be subject to the mandate of Article IX, Section 7. We affirm the Court of Appeals' holding that these library fees are not subject to Article IX, Section 7.

As noted earlier, Article IX, Section 7 applies to the penal laws of the State, meaning those statutes imposing a monetary payment for their violation and which are punitive rather than remedial in nature. *Mussallam*, 321 N.C. at 508-09, 364 S.E.2d at 366-67. In this instance the authorizing statute provides a broad grant of power, but does not specifically authorize the fees charged by the University libraries. However, defendants' answers to interrogatories reveal that the fees collected for lost and damaged materials are calculated from the replacement cost of the book, plus an additional twenty-five dollar fee for "reacquisition and recataloging." Thus, the funds received are used exclusively for the costs associated with the replacement of the items lost or damaged by the user. This payment is remedial in nature since the funds are collected to repair harm done by the offending party. *See Shore*, 290 N.C. at 633-34, 227 S.E.2d at 559. Similarly, the money collected for late return of a book compensates the institution for the additional costs necessary to have sufficient quantities of materials for all users, a need which arises when a patron retains materials longer than the allocated time.

Plaintiffs contend that the late fee collected for an overdue book is no different from a parking fine for over-parking. However, the fee collected for an overdue book differs from a parking penalty in that the patron, usually a student or faculty member, has the privilege of using the book without cost for the designated period; and the fees are normally assessed based upon daily or hourly overage. To the contrary, a person who uses a parking space without depositing money in the meter has violated the law; and if ticketed, the penalty is a set amount whether the person parked for two minutes or for two hours. Moreover, the library patron is usually entitled to borrow the book free of charge for an additional period by renewing the check-out. Hence, the late fee is in the nature of a user fee designed to manage the collection, as opposed to a penalty. We conclude, therefore, that the monies collected for library materials are remedial and, thus, not subject to Article IX, Section 7.

Having determined that these library charges are not subject to Article IX, Section 7, we do not address defendants' argument related to Article IX, Section 9 or the Court of Appeals' reliance thereon. For the reasons stated herein, we affirm the decision of the Court of Appeals on this issue.

## VI.    Monies Collected by the Department of Transportation for Violations of Axle Weight Limits

**[5]** Based on the dissenting opinion in the Court of Appeals, defendants Tippett and Howard appealed the issue of whether the clear proceeds of payments collected by the North Carolina Department of Transportation ("DOT") pursuant to N.C.G.S. § 20-118(e) are subject to Article IX, Section 7. The majority in the Court of Appeals determined that the penalties were assessed for unlawful conduct under N.C.G.S. § 20-115 and were, thus, payable to the public schools. *N.C. Sch. Bds. Ass'n*, 160 N.C. App. at 269, 585 S.E.2d at 429. The dissenting judge agreed with defendants that the penalties were assessed to compensate the State for damage caused to the highways by the operation of overweight vehicles and were not payable to the public schools. The dissenting judge further concluded that the annual registration fee and penalties for overweight vehicles are " 'compensatory taxes for the use and privileges of the public highways of this State' " which are paid into the Highway Fund to finance the maintenance of roads, and are, accordingly, remedial not punitive. *Id.* at 285-87, 585 S.E.2d at 438-40 (quoting N.C.G.S. § 20-97 (2001)).

On appeal to this Court, defendants contend that the majority of the Court of Appeals erred and argue that the penalties assessed against the owners of overweight vehicles are reimbursement for damages or are a tax. We disagree.

For purposes of licensing, the weight of a self-propelled property-carrying vehicle is determined by the empty weight and the heaviest load to be carried as declared by the owner or operator, with limitations and calculations specified in the statute. N.C.G.S. § 20-88(a) (2003). A vehicle driven with a weight in excess of its declared gross weight is subject to axle-group weight penalties under N.C.G.S. § 20-118(e) as determined by the amount the actual gross weight exceeds the declared gross weight. *Id.* § 20-88(k) (2003). Section 118(b) establishes axle weight limitations, and subsection (e) of section 118, entitled "Penalties," prescribes "civil penalties" for operating a vehicle in violation of the axle weight limits, calculated on a graduated scale based on the pounds in excess of the limit. *Id.* § 20-118(b) and (e) (2003). This penalty is assessed against the owner or registrant of the vehicle. *Id.* § 20-118(e). Finally, N.C.G.S. § 20-115 declares that "[i]t shall be unlawful for any person to drive or move or for the owner to cause or knowingly permit to be driven or moved on any highway any vehicle or vehicles of a size or weight exceeding the limitations stated in this title."

Defendants first argue that the Court of Appeals erred in finding the conduct unlawful pursuant to N.C.G.S. § 20-115. Defendants base this assertion on their contention that N.C.G.S. § 20-115 is directed to the driver of the vehicle, while N.C.G.S. § 20-118(e) is directed to the owner or registrant of the vehicle. Defendants next argue that, since pursuant to N.C.G.S. § 20-118(e) a violation of section 118 is not punishable under N.C.G.S. § 20-176 as an infraction or violation of the criminal law, the penalty for violation of the weight limit is not punitive in nature. Neither of these arguments has merit. By its plain language N.C.G.S. § 20-115 is directed at both the driver and the owner of the vehicle. Further, the law is well settled that Article IX, Section 7 applies to both civil and criminal penalties. *Mussallam*, 321 N.C. at 508-09, 364 S.E.2d at 366-67. Thus, the fact that a violation is not punishable as a crime does not establish that the penalty is not penal in nature.

Defendants also argue that the "civil penalty" is remedial in nature in that the payments compensate the State for damages to the highways caused by overweight vehicles. Defendants rely heavily on the affidavit of the Deputy Chief for Operations of the DOT,

who opined that "[a]lthough many other factors contribute to road failures, in my opinion overweight vehicles accelerate the deterioration of pavements which causes premature failures of the roadways in this state which the Department of Transportation repairs." Defendants argue that the use of a graduated scale based on excess pounds to calculate the penalty signifies that the penalty has a reasonable relationship to the injury caused and that because these funds are deposited in the Highway Fund, the penalty is remedial rather than punitive. We do not find these arguments persuasive.

As plaintiffs note, nothing in the record supports a conclusion that a correlation exists between the graduated scale for the penalties and the cost of repair to the highways. The scale is a measure of the degree of the violation. Moreover, funds deposited in the Highway Fund are used for purposes other than repair and maintenance of roadways damaged by overweight vehicles. As noted earlier, this Court has recognized restitution in the context of Article IX, Section 7 only when the damages were specifically quantified. *Shore*, 290 N.C. at 633-34, 227 S.E.2d at 559.

We similarly reject defendants' argument that the penalty is a tax. As plaintiffs observe, the underlying premise to defendants' argument is that the licensing and registration fee imposed in N.C.G.S. § 20-88(a) is a tax although the statute makes no mention of a tax. Defendants then argue that N.C.G.S. § 20-97 supports the claim that the registration fee is a tax, but N.C.G.S. § 20-97 does not suggest that registration fees are taxes. Furthermore, the statutes cited by defendants, namely, N.C.G.S. §§ 20-88, 20-85, and 20-87, refer to fees and are contained in Part 7 of Article 3 entitled "Title and Registration Fees." Section 20-85(b) directs that all but one of the title and registration fees collected under the statute are to be paid into the Highway Trust Fund, not the Highway Fund, as provided for the taxes referenced in N.C.G.S. § 20-97. Defendants' reliance on *Helvering v. Mitchell* is also misplaced in that *Mitchell* dealt with the issue of whether a tax penalty under the Internal Revenue Code constituted criminal punishment for purposes of the Double Jeopardy Clause. 303 U.S. at 398-99, 82 L. Ed. at 921. Moreover, the underlying rationale of the United States Supreme Court's decision is not applicable in the context of penalties collected under N.C.G.S. § 20-118(e). These penalties are not a safeguard to protect the State's revenues nor is there evidence that punishment of the owners of overweight vehicles entails extensive investigation or litigation. *Id.* at 401, 82 L. Ed. at 923.

Throughout Article 3, the General Assembly referred to the penalties in N.C.G.S. § 20-118(e) as a civil penalty. The language chosen manifests the legislature's intent that the penalty be imposed to punish those who own motor vehicles operating on the highways of the State while carrying loads that exceed the statutory weight limitations, conduct which violates the State's motor vehicle laws and is deemed unlawful. N.C.G.S. § 20-115 (2003). That the violation causes harm supplies the rational basis for imposing the penalty but does not undermine the intent of the legislature to punish those who cause the harm. We hold, therefore, that payments under N.C.G.S. § 20-118(e) are subject to Article IX, Section 7 and belong to the public schools.

VII.  Payments Collected by the Department of Transportation for Lapses in Insurance Coverage

[6] This Court allowed the petition for discretionary review filed by defendants Howard and Ross on the issue of whether the Court of Appeals erred in holding that monies collected as civil penalties under section 20-309(e) are subject to Article IX, Section 7. Section 20-309(e) provides:

The Division [of Motor Vehicles], upon receiving notice of a lapse in insurance coverage, shall notify the owner of the lapse in coverage, and the owner shall, to retain the registration plate for the vehicle registered or required to be registered, within 10 days from date of notice given by the Division either:

(1) Certify to the Division that he had financial responsibility effective on or prior to the date of such termination; or

(2) In the case of a lapse in financial responsibility, pay a fifty dollar ($50.00) civil penalty; and certify to the Division that he now has financial responsibility effective on the date of certification. . . .

N.C.G.S. § 20-309(e) (2003). Additionally, section 20-309(e) requires, subject to certain conditions, that the insurer notify the Division of the termination of a policy providing financial responsibility within twenty business days of the termination. Id. "Any person, firm or corporation failing to give notice of termination shall be subject to a civil penalty of two hundred dollars ($200.00) to be assessed by the Commissioner of Insurance upon a finding by the Commissioner of Insurance that good cause is not shown for such failure to give notice of termination to the Division." Id.

**N.C. SCHOOL BDS. ASS'N v. MOORE**

[359 N.C. 474 (2005)]

Defendants argue that the payment by the owner is voluntary. We disagree. Subsequent language in the same subsection demonstrates that the fifty dollar civil penalty paid by the owner for lapsed coverage is not voluntary. *Id.* The statute further provides that if the owner fails to make the required certification, the registration is automatically revoked for thirty days if the registration plate has not been surrendered to the Division of Motor Vehicles before the termination date; and in order to reregister the vehicle, the owner must pay a restoration fee of fifty dollars plus the appropriate fee for a new registration plate. *Id.* Thus, the fifty dollar civil penalty for lapsed coverage is not a convenience to the owner as defendants contend. The purpose of the penalty is to penalize the owner of a vehicle who violates the statutes requiring financial responsibility to cover injury and damage occurring in the operation of an automobile on the highways of North Carolina.

With respect to the payment by the insurer for failure to give the required notice of termination of insurance, defendants argue that because the purpose of the Financial Responsibility Act is remedial, this civil penalty imposed against the insurer is also remedial. We are not persuaded. This Court has previously held that:

> the General Assembly appears to have intended that the civil penalty be the exclusive sanction for failure to give DMV the required notice of termination. This interpretation is bolstered by the title to the chapter enacting the civil penalty: "AN ACT TO REWRITE G.S. 20-309(E) TO PROVIDE FOR NOTICE OF TERMINATION RATHER THAN INTENT TO TERMINATE BY CARRIERS OF MOTOR VEHICLE LIABILITY INSURANCE COVERAGE *AND PENALTY FOR NONCOMPLIANCE.*" 1975 N.C. Sess. Laws, ch. 302, § 1 (emphasis added).

*Allstate Ins. Co. v. McCrae,* 325 N.C. 411, 417, 384 S.E.2d 1, 4-5 (1989). Moreover, defendants have not shown that the penalty is designed to compensate for particular damages incurred by the State or an individual victim. *See Shore,* 290 N.C. at 633-34, 227 S.E.2d at 559. We hold that the penalties imposed under N.C.G.S. § 20-309(e) are subject to Article IX, Section 7 and belong to the public schools.

Plaintiffs in their argument on this issue also raise the issue of monies collected by DOT for the misuse of dealer license plates pursuant to N.C.G.S. § 20-79(e). The trial court ruled that these collections were subject to Article IX, Section 7. Although defendants

assigned error to this issue, they did not make it the basis of an argument in the Court of Appeals. Therefore, the assignment of error is deemed abandoned. N.C. R. App. P. 28(a), (b)(6).

VIII.  Payments Collected by the Employment Security Commission for Overdue Employer Contributions, Late Reports, and Returned Checks

**[7]** Plaintiffs also contend that the Court of Appeals erred in reversing the trial court's judgment that monies collected by the Employment Security Commission ("ESC") under Chapter 96 of the General Statutes (Employment Security Act) were subject to Article IX, Section 7. At the outset, we note that plaintiffs alleged in their complaint and the trial court ruled that the public schools were entitled to the proceeds of penalties collected by the ESC pursuant to section 96-10 for overdue employer contributions, for late filing of required reports, and for a check returned for insufficient funds. These penalties are prescribed in sections 96-10(a), (g), and (h). In their new brief to this Court, plaintiffs now include the penalty collected by the ESC pursuant to section 96-9(a)(7) for an employer's failure to file wage reports as required by statute. Since the trial court had no opportunity to consider the applicability of Article IX, Section 7 to section 96-9(a)(7), consideration of this provision is not properly before the Court, and our holding is limited to those statutory provisions on which the trial court and the Court of Appeals ruled.

The Court of Appeals accepted defendants' contention that N.C.G.S. § 96-10 "defines employers' contribution to the Unemployment Insurance Fund as a 'tax,' " and construed the penalties paid pursuant to section 96-10 as part of the "taxes" or "additional taxes." *N.C. Sch. Bds. Ass'n*, 160 N.C. App. at 272-73, 585 S.E.2d at 431. The Court of Appeals concluded that these "additional taxes" were remedial rather than punitive in nature, citing the United States Supreme Court's holding in *Mitchell*, 303 U.S. at 401, 82 L. Ed. at 923. 160 N.C. App. at 273, 585 S.E.2d at 431.

All parties agree that these payments to the ESC should be treated in the same manner as payments to the Department of Revenue for failure to comply with the tax provisions in Chapter 105. The parties disagree, however, as to how these payments and those under Chapter 105 should be treated for purposes of Article IX, Section 7. Plaintiffs contend that the payments are penalties imposed for violation of the statutory requirements and are, therefore, payable to the public schools. We agree.

**N.C. SCHOOL BDS. ASS'N v. MOORE**

[359 N.C. 474 (2005)]

Neither defendants nor the Court of Appeals cites to specific language in the statute defining the employer contributions as taxes. The definitions section of Chapter 96 characterizes the payments made to the Unemployment Insurance Fund as "contributions." N.C.G.S. § 96-8(3) (2003). Admittedly, certain statutes use the term "tax" interchangeably with the word "contribution," for example, N.C.G.S. § 96-10(a), but these isolated references do not compel the conclusion that the payments made as penalties are likewise to be classified as taxes. The General Assembly has designated each of these payments as a penalty: (i) "[a]n additional penalty in the amount of ten percent (10%) of the taxes due shall be added," *Id.* § 96-10(a); (ii) "[a]n employer who fails to file a report within the required time shall be assessed a late filing penalty of five percent . . . ," *Id.* § 96-10(g); and (iii) "[w]hen any uncertified check is tendered in payment of any contributions to the Commission and such check shall have been returned unpaid . . . a penalty shall be payable to the Commission . . . ," *Id.* § 96-10(h).

The statute requires that interest be assessed on all contributions that are paid late, and the interest, which compensates for lost revenues, is tallied separately from the "additional penalty" that is assessed. *Id.* § 96-10(a). Further, of note, interest and penalties collected on late contributions are placed in the Special Employment Security Administration Fund, not the Unemployment Insurance Fund. *Id.* The Special Employment Security Administration Fund may be used for, among other things, "extensions, repairs, enlargements and improvements to buildings, and the enhancement of the work environment in buildings used for Commission business." *Id.* § 96-5(c) (2003). Nothing in the statute suggests that the penalty is in any way remedial or intended to preserve the integrity of the Unemployment Insurance Fund. Rather, the penalty is assessed, in addition to interest, to penalize an employer for noncompliance with a statutory mandate. As with any other punishment, the threat of a hefty penalty may deter noncompliance, but this deterrence factor does not transform the penalty into a remedial tax.

We hold that the penalties collected under N.C.G.S. § 96-10 are subject to Article IX, Section 7 and are payable for the benefit of the public schools. Accordingly, we reverse the decision of the Court of Appeals on this issue.

## IX.  Monies Collected by State Agencies and Licensing Boards for Late Renewal of Licenses or Late Payment of License Fees

[8] Plaintiffs further assert that the Court of Appeals erred by holding that payments collected by state agencies and licensing boards for the late renewal of licenses or the late payment of licensing fees are not subject to Article IX, Section 7. The Court of Appeals reasoned that the record revealed that the payments were intended to "compensate the collecting agency for additional operating expenses incurred in collecting money due or compelling performance of a licensing requirement." *N.C. Sch. Bds. Ass'n*, 160 N.C. App. at 283, 585 S.E.2d at 437. The Court of Appeals discerned no punitive intent given the small amount of the fees specified by the authorizing statutes. *Id.* For the reasons articulated below, we affirm the Court of Appeals as to this issue.

Payments to four different licensing boards are at issue in this case. Sections 88B-20 and 88B-21 authorize the North Carolina Board of Cosmetic Art Examiners ("Cosmetic Arts Board") to collect a "late fee" from the holder of a license for late renewal of the license and for reinstatement of an expired license. N.C.G.S. §§ 88B-20, -21 (2003). The North Carolina State Bar ("State Bar") collects a "late fee" pursuant to section 84-34 from members of the State Bar who fail to pay an annual membership fee by a certain date. *Id.* § 84-34 (2003). Similarly, the State Board of Examiners of Electrical Contractors ("Electrical Contractors Board") is authorized to assess an "administrative fee" under section 87-44 from any licensed electrical contractor who fails to renew his or her license by the expiration date established by the Electrical Contractors Board. *Id.* § 87-44 (2003).[3] Finally, under the current version of section 87-22, the State Board of Examiners of Plumbing, Heating, and Fire Sprinkler Contractors ("Plumbing Contractors Board") shall "increase the license fee by twenty-five dollars" for the late renewal of a license. *Id.* § 87-22 (2003). We note, however, that in the version of Section 87-22 in effect when this litigation was commenced and until 6 July 2001, a person or entity who failed to renew a license in a timely fashion was charged a "penalty for nonpayment" in the amount of ten percent (10%) of the annual licensing fee for each month the payment was delayed, but the "penalty for nonpayment [could] not exceed the amount of the annual fee." *Id.* § 87-22 (1999).

---

3. In the version of this statute in effect at the time plaintiffs' complaint was filed, this fee was termed a "late renewal fee." N.C.G.S. § 87-44 (1999).

This Court has recognized that payments to state agencies may be remedial when the payment is for "particular damage or loss to it over and above its normal operating costs." *Shore*, 290 N.C. at 633-34, 227 S.E.2d at 559. In the statutes under consideration, the use of the term "fee" to describe the payments collected by the Cosmetic Arts Board, the State Bar, the Electrical Contractors Board, and the Plumbing Contractors Board after 6 July 2001 manifests the legislature's intent that these payments be remedial rather than punitive. *See Mussallam*, 321 N.C. at 509, 364 S.E.2d at 367. The penalty is a revocation or suspension of the license and whatever sanctions the statute may authorize for a person's continued practice of the trade or profession during the period of revocation or suspension. *See, e.g.*, N.C.G.S. §§ 87-23, 87-47, 88B-24, and 88B-29. The fee, or in the case of plumbing and heating contractors the nonpayment penalty, is an administrative charge to cover the costs of collecting the license fees. As the record reflects, these boards are dependent upon the revenue generated from fees to perform their statutorily mandated services. As illustrated by answers to interrogatories, the late fees collected often do not cover the expense incurred in attempting to collect the license fees. Inasmuch as these late fees or penalties are not intended to punish the licensee, they are not subject to Article IX, Section 7.

Defendants also argue in their brief before this Court that payments made to the Department of Commerce by credit unions for failing to file timely reports pursuant to N.C.G.S. § 54-109.15(b) and payments made to the Department of Environment and Natural Resources for the untimely payment of food and lodging establishment inspection fees pursuant to N.C.G.S. § 130A-248(d) and for the untimely payment of an annual underground storage tank operating fee pursuant to N.C.G.S. § 143-215.94C(e) are remedial. Although defendants briefed these issues in the Court of Appeals, neither the majority nor the dissent in the Court of Appeals addressed them; and defendants did not petition for discretionary review of these issues in this Court. Accordingly, these issues are not properly before this Court, N.C. R. App. P. 16(a), and we decline to address them.

X. Payments by an Environmental Violator to Fund a "Supplemental Environmental Project"

[9] On discretionary review, defendants contend the Court of Appeals erred in affirming the trial court's ruling that payments by an environmental offender to fund a Supplemental Environmental

Project in lieu of paying a portion of a civil penalty assessed by DENR are subject to Article IX, Section 7. Defendants also contend the Court of Appeals erred in holding that payments by the City of Kinston to fund a specific SEP establishing a water resources training program at Lenoir Community College were subject to Article IX, Section 7.

DENR is authorized to assess civil penalties against any person or entity violating various environmental provisions set out in Chapter 143 of the General Statutes. N.C.G.S. §§ 143-215.6A, -215.88A, and -215.114A (assessing civil penalties for violations of, respectively, water quality laws, oil and hazardous substances storage laws, and air pollution control laws). Each of these statutes provides that "the clear proceeds of civil penalties provided for in this section shall be remitted to the Civil Penalty and Forfeiture Fund in accordance with G.S. 115C-457.2." *Id.* §§ 143-215.88A(c) (2003); *see also id.* §§ 143-215.6A(h1) and -215.114A(h) (2003).

The dispute over the penalty in this case arises out of a policy memorandum issued by DENR in April 1998 creating an alternative enforcement mechanism whereby some portion of an assessed civil penalty may be applied to a SEP. The memorandum states:

> Current statutory requirements dictate that civil penalties collected through the enforcement process be set-aside [sic] for educational purposes. Although public education is a very important and a sincere use of these funds, the process returns very little to the environment which often suffers as a result of these environmental violations. This policy will set up a mechanism to provide opportunities for environmental benefit as a result of negotiated settlements where some portion of the settlement agreement may be in the form of a Supplemental Environmental Project (SEP).
>
> Supplemental Environmental Projects are defined as projects that are beneficial to the environment and/or to public health that a defendant agrees to perform as part of a settlement to an enforcement action. . . . During development of potential settlement arrangements, staff may introduce the possibility of a SEP but should leave the final decision of whether or not to perform a SEP entirely up to the defendant. The SEP should bear some relationship, or nexus, to the violation.

Defendants argue that because the payments to the SEP are voluntary, are made to a third party, and are remedial in nature, the pay-

**N.C. SCHOOL BDS. ASS'N v. MOORE**

[359 N.C. 474 (2005)]

ments do not accrue to the State and are not subject to Article IX, Section 7. Defendants also assert that the Court of Appeals construed this Court's decision in *Craven Cty. Bd. of Educ. v. Boyles* too broadly. We disagree.

In *Craven County*, the board of education instituted a declaratory judgment action to recover proceeds paid by the Weyerhaeuser Company to the Department of Environment, Health and Natural Resources under a settlement agreement entered into after the Department assessed a civil penalty against the company for violation of the air pollution laws. 343 N.C. 87, 468 S.E.2d 50. The settlement agreement provided that the payments did " 'not constitute, nor shall they be construed as forfeitures, fines, penalties or payments in lieu thereof.' " *Id.* at 89, 468 S.E.2d at 51. In holding that the payment was subject to Article IX, Section 7, this Court stated:

> In the instant case, it is not determinative that the monies were collected by virtue of a settlement agreement, nor is it determinative that defendants and Weyerhaeuser stated that the payment not be construed as a penalty. The monies were paid to settle the assessment of a penalty for violations of environmental standards. As we said in *Cauble*, it is neither "the label attached to the money" nor "the [collection] method employed," but "the nature of the offense committed" that determines whether the payment constitutes a penalty.

*Id.* at 92, 468 S.E.2d at 53.

Similarly, in the present case, that the payment was made to a third party pursuant to a SEP incorporated into a settlement agreement does not change the nature of the payment. The payment would not have been made had DENR not assessed a civil penalty against the City of Kinston for violating a water quality law. To suggest that the payment was voluntary is euphemistic at best. Moreover, the money paid under the SEP did not remediate the specific harm or damage caused by the violation even though a nexus may exist between the violation and the program at the community college to train waste water treatment employees. The payment was still punitive in nature. Nor is the nature of the payment by the City of Kinston or any other violator altered by its being made to a third party pursuant to a policy promulgated by DENR in an attempt to circumvent the statutory and constitutional requirement that the clear proceeds of civil penalties be paid to the Civil Penalty and Forfeiture Fund.

In *Shore v. Edmisten* this Court held that neither statutes nor judgments could be effective "to direct payment of a fine anywhere other than to the counties for the use of the public schools." 290 N.C. at 633, 227 S.E.2d at 558. While the Secretary of DENR is authorized to remit civil penalties, *see, e.g.*, N.C.G.S. § 143-215.6A(f), that authority does not override the constitutional requirement in Article IX, Section 7. The payment in this case was triggered by an environmental violation for which the General Assembly authorized DENR to punish the violator. The statutory authorization may not be changed in form by the unilateral action of DENR. Defendants do not dispute that the payment authorized in the statute is punitive in nature. Thus, a payment to fund a SEP remains punitive.

Defendants also argue that the payments which are required to complete SEPs are remedial rather than punitive. The policy memorandum drafted by DENR employees indicates that the SEP payments are not intended to punish the violator but to improve the environment. However, this Court has held that the terms and descriptions DENR and a violator use to refer to a payment are not determinative. *Craven Cty. Bd. of Educ.*, 343 N.C. at 92, 468 S.E.2d at 53. Defendants further contend that the nature of the SEP itself is remedial rather than punitive. In *Craven County* we held that a penalty's nature is not changed merely because the violator paid it pursuant to a settlement agreement. *Id.*

We note that in their brief defendants argue that pursuant to Article IV, Section 3 of the North Carolina Constitution, DENR, acting through its Secretary, has quasi-judicial powers as may be reasonably necessary to accomplish the purposes for which the agency was created and that in exercising the quasi-judicial power to remit a penalty through the use of the SEP, the Secretary was promoting DENR's purpose of protecting the environment by funding a remedial action necessary to prevent additional harm to the environment. Hence, the action was not without statutory or regulatory authority, nor was it an unconstitutional diversion of public school property or revenue. This argument, however, was not raised in the Court of Appeals and cannot be made for the first time in this Court. *See Pue v. Hood*, 222 N.C. 310, 313, 22 S.E.2d 896, 898 (1942) (parties may not " 'change horses in the middle of the stream' " (citations omitted)).

We affirm the holding of the Court of Appeals that monies paid to fund a SEP, including the money paid by the City of Kinston to Lenoir Community College, are subject to Article IX, Section 7.

## XI. The Constitutionality of the Civil Penalty Fund and the School Technology Fund

**[10]** Plaintiffs contend the Court of Appeals erred by holding that the General Assembly's statutory scheme for distribution of monies gathered pursuant to Article IX, Section 7, codified in Article 31A of Chapter 115C (N.C.G.S. §§ 115C-457.1 to -457.3),[4] is constitutional. Plaintiffs argue that the General Assembly is limited in its ability to direct how the funds are collected and distributed to the local public school systems and for what purposes the funds may be used. We disagree.

The General Assembly created the Civil Penalty Fund in N.C.G.S. § 115C-457.1. The statute reads:

(a) [ ] There is created the Civil Penalty and Forfeiture Fund. The Fund shall consist of the clear proceeds of all civil penalties and civil forfeitures that are collected by a State agency and are payable to the County School Fund pursuant to Article IX, Section 7 of the Constitution.

. . . .

(b) The Fund shall be administered by the Office of State Budget and Management. The Fund and all interest accruing to the Fund shall be faithfully used exclusively for maintaining free public schools.

N.C.G.S. § 115C-457.1 (2003). The legislature further provided:

Notwithstanding any other law, all funds which are civil penalties or civil forfeitures within the meaning of Article IX, Section 7 of the Constitution shall be deposited in the Civil Penalty and Forfeiture Fund. The clear proceeds of such funds include the full amount of all such penalties and forfeitures collected under authority conferred by the State, diminished only by the actual costs of collection, not to exceed ten percent (10%) of the amount collected.

---

4. Pursuant to the constitutional amendment to Article IX, Section 7, effective 1 January 2005, these statutes were similarly amended consistent with the constitutional amendment. The constitutional amendment added subsection (b) which authorizes the General Assembly to place the clear proceeds of all civil penalties, forfeitures, and fines into a state fund. Act of July 18, 2003, ch. 423, sec. 2, 3, 3.2, 2003 N.C. Sess. Laws 1284, 1284-85.

*Id.* § 115C-457.2 (2003). The General Assembly additionally prescribed how the funds paid into the Civil Penalty Fund were to be disbursed:

> The Office of State Budget and Management shall transfer funds accruing to the Civil Penalty and Forfeiture Fund to the State School Technology Fund. These funds shall be allocated to counties on the basis of average daily membership.

*Id.* § 115C-457.3 (2003). Pursuant to N.C.G.S. § 115C-102.6D, the State School Technology Fund ("Technology Fund") is allocated to local school administrative units, but must be used by the local school systems "to implement [each system's] local [school system technology] plan or as otherwise specified by the General Assembly." *Id.* § 115C-102.6D(c) (2003).

The statutory scheme described in N.C.G.S. § 115C-457.1 through -457.3 does not violate Article IX, Section 7 of the North Carolina Constitution. This Court has long recognized that some constitutional provisions are self-executing while others require legislative action to implement and enforce the purpose and mandates of the provision. In *Kitchin v. Wood*, 154 N.C. 446, 154 N.C. 565, 70 S.E. 995 (1911), we held that a self-executing provision is "complete in itself, needs no legislation to give it effect and no special means for its enforcement." *Id.* at 448, 154 N.C. at 568, 70 S.E. at 996. Article IX, Section 7 of our state constitution, applicable to this litigation, does not fall into the category of self-executing provisions. This Court has held previously that the provision requires clarification at least as to the issue of what constitutes "clear proceeds" of the relevant penalties. *Cauble*, 314 N.C. at 602-06, 336 S.E.2d at 62-64. As that holding implies, the constitutional provision does not provide on its face a complete road map of how its mandate is to be implemented and enforced.

Since this constitutional provision is not self-executing, the General Assembly's actions in specifying how the provision's goals are to be implemented must be held to be constitutional unless the statutory scheme runs counter to the plain language of or the purpose behind Article IX, Section 7. "[T]his Court gives acts of the General Assembly great deference, and a statute will not be declared unconstitutional under our Constitution unless the Constitution clearly prohibits that statute." *In re Spivey*, 345 N.C. 404, 413, 480 S.E.2d 693, 698 (1997). Moreover, "a constitution should generally be given, not essentially a literal, narrow, or technical interpretation, but

one based upon broad and liberal principles designed to ascertain the purpose and scope of its provisions." *Elliott v. State Bd. of Equalization*, 203 N.C. 749, 753, 166 S.E. 918, 920-21 (1932). Applying these principles, we hold that Article 31A of Chapter 115C merely specifies details which are omitted from the broad language of Article IX, Section 7.

As quoted above, Article IX, Section 7 of the North Carolina Constitution states that "the clear proceeds of all penalties and forfeitures and of all fines collected in the several counties . . . shall belong to and remain in the several counties, and shall be faithfully appropriated and used exclusively for maintaining free public schools." N.C. Const. art. IX, § 7. Plaintiffs assert that the phrase "shall belong to and remain in the several counties" requires that administrative fines within the purview of this provision must remain in the county where they are paid; thus, the funds are not subject to legislative control and local school boards necessarily have discretion as to how to spend these funds. The constitutional provision, however, does not dictate specifically that funds shall remain in the county where collected, but only within the "several counties." Contrary to plaintiffs' contention, the use of the phrase "several counties" suggests that the drafters intended that the funds not stay in one particular county, but rather in the "several counties" of the State of North Carolina. By directing that funds subject to Article IX, Section 7 of the Constitution be remitted to the Civil Penalty Fund and returned to the county school systems, the General Assembly has fully complied with the mandate embodied in the phrase "belong to and remain in the several counties."

Plaintiffs also submit that the General Assembly has violated the Article IX, Section 7 mandate that the funds be "faithfully appropriated and used exclusively for maintaining free public schools" by requiring that the contents of the Civil Penalty Fund be deposited into the Technology Fund for use solely to implement local school systems' technology plans. However, implementation of technology plans in local public school systems is clearly within the purview of the provision's broad mandate. " '[T]he General Assembly . . . is possessed of full legislative powers unless restrained by express constitutional provision or necessary implication therefrom.' " *Gwathmey v. State ex rel. Dep't of Env't, Health, and Natural Res.*, 342 N.C. 287, 303, 464 S.E.2d 674, 683-84 (1995) (quoting *Thomas v. Sandlin*, 173 N.C. 378, 381, 173 N.C. 329, 331, 91 S.E. 1028, 1029 (1917)), *quoted in Martin v. N.C. Hous. Corp.*, 277 N.C. 29, 41, 175 S.E.2d 665, 671

(1970). Given that Article IX, Section 7 does not explicitly stipu-
late how civil penalties should be used to maintain public schools,
the General Assembly's assignment of these funds to public school
systems' technology plans is not unconstitutional. The decision of
the Court of Appeals upholding the constitutionality of sections
115C-457.1 through -457.3 is affirmed.

## XII. Proper Disposition of Civil Penalties Paid by Public School Systems to State Agencies

**[11]** Plaintiffs last raise the issue of whether the Court of Appeals
properly held that civil penalties paid by the State's public school sys-
tems should not be paid into the Civil Penalty Fund for distribution
back to school systems. Plaintiffs also dispute the Court of Appeals'
decision permitting the payment of $11,000.00 by the Edgecombe
County Board of Education to DENR to remain with DENR, the col-
lecting agency, rather than to be paid into the Civil Penalty Fund. We
agree with plaintiffs and reverse the Court of Appeals' decision on
this issue.

In reaching the conclusion that the funds paid by public schools
as civil penalties are not subject to Article IX, Section 7, the Court of
Appeals bypassed the *Mussallam* analysis as to whether each pay-
ment is punitive or remedial. *N.C. Sch. Bds. Ass'n*, 160 N.C. App. at
281, 585 S.E.2d at 436. Instead, the Court of Appeals cited this Court's
statement in *Davenport v. Patrick* that " '[p]ublic policy in this juris-
diction . . . will not permit a wrongdoer to enrich himself as a result
of his own misconduct.' " *Id.* (quoting *Davenport v. Patrick*, 227 N.C.
686, 689, 44 S.E.2d 203, 205 (1947)). The Court of Appeals reasoned
that to follow strictly the mandate of the Constitution and the statu-
tory scheme devised by the General Assembly would allow the vio-
lating school to be "unjustly enriched by its own wrongdoing" and so
would violate the public policy of the State. *N.C. Sch. Bds. Ass'n*, 160
N.C. App. at 281-82, 585 S.E.2d at 436.

The dissent in the Court of Appeals relied on the same rationale
to reach a different conclusion. Accepting the premise that the pub-
lic policy of the State precludes an offending school system from
receiving any of the funds it paid as a penalty, the dissent nonetheless
argued that not all public school systems should be punished for one
school system's wrongdoing. As the dissenting opinion states,
"[P]ublic policy . . . does not mandate that the remaining school sys-
tems should be punished for the wrongdoing of another; it simply
mandates that the offending school system be removed from the cal-

culation of how to distribute the funds collected from the offending school system among the remaining public school systems." *Id.* at 288, 585 S.E.2d at 440. The dissent endorses an approach under which monies in the Civil Penalty Fund would be distributed to the school systems eligible under the statute while omitting the system which engaged in wrongdoing. *Id.* We disagree with the approaches suggested by both the majority and the dissent.

Under the plain language of Article IX, Section 7 of the North Carolina Constitution and the enabling statutes, N.C.G.S. §§ 115C-457.1 through -457.3, monies paid by local public school systems as civil penalties must be remitted to the Civil Penalty Fund for return to all of the public schools in the manner dictated by N.C.G.S. § 115C-457.3. Neither the State Constitution nor the statutory scheme makes any exception for schools which committed wrongdoing. Despite any misgivings this Court may have about the wisdom of this omission, "[t]he general rule in North Carolina is that absent 'constitutional restraint, questions as to public policy are for legislative determination.' " *State v. Whittle Communications*, 328 N.C. 456, 470, 402 S.E.2d 556, 564 (1991) (quoting *Gardner v. N.C. State Bar*, 316 N.C. 285, 293, 341 S.E.2d 517, 522 (1986)). We are constrained by the General Assembly's choice not to omit from the distribution scheme those school systems which committed wrongdoings. The nature of the party committing the violation of state law which leads to the civil penalty does not change the nature of the civil penalty itself, which we have held to be determinative as to whether the penalty accrues to the Civil Penalty Fund. *See Mussallam*, 321 N.C. at 508-09, 364 S.E.2d at 366-67. Accordingly, we hold that monies received from civil penalties paid by public schools must be deposited into the Civil Penalty Fund, after which the monies will be distributed to all local public school systems statewide as mandated by statute.

For the foregoing reasons, the opinion of the Court of Appeals is affirmed in part and reversed in part, and the case is remanded to that court for remand to the trial court for proceedings not inconsistent with this opinion.

AFFIRMED IN PART; REVERSED IN PART.

Justice NEWBY did not participate in the consideration or decision of this case.