IN THE COURT OF APPEALS OF NORTH CAROLINA

 No. COA17-1374

 Filed: 4 September 2018

Wake County, No. 16 CVS 12965

FRANCIS X. DE LUCA and THE NEW HANOVER COUNTY BOARD OF
EDUCATION, Plaintiffs,

 v.

JOSH STEIN, in his capacity as Attorney General of the State of North Carolina,
Defendant,

 and

NORTH CAROLINA COASTAL FEDERATION and SOUND RIVERS, INC.,
Intervenors.

 Appeal by plaintiff from order entered 12 October 2017 by Judge Paul C.

Ridgeway in Wake County Superior Court. Heard in the Court of Appeals 20 June

2018.

 Stam Law Firm, PLLC, by Paul Stam and Amy C. O’Neal, for plaintiff-
 appellants.

 Attorney General Joshua H. Stein, by Special Deputy Attorneys General Marc
 Bernstein and Jennie Wilhelm Hauser, for defendant-appellee Joshua H. Stein
 in his capacity as Attorney General of the State of North Carolina.

 Southern Environmental Law Center, by Mary Maclean Asbill, Brooks Rainey
 Pearson and Blakely E. Hildebrand, for intervenor-appellees North Carolina
 Coastal Federation and Sound Rivers, Inc.

 Tharrington Smith, L.L.P., by Deborah R. Stagner and Lindsay Vance Smith,
 for amicus curiae North Carolina School Boards Association.
 DE LUCA V. STEIN

 Opinion of the Court

 TYSON, Judge.

 Plaintiffs’ appeal asserts the trial court erred in concluding, as a matter of law,

that payments specified in an agreement between the Attorney General of North

Carolina and Smithfield Foods, Inc., and its subsidiaries are not civil penalties

required to be used to fund public education pursuant to Article IX, § 7 of the North

Carolina Constitution. The trial court’s order granting the defendant’s motion for

summary judgment and denying the plaintiffs’ cross-motion for summary judgment

is reversed in part and remanded for trial.

 I. Background

 On 25 July 2000, Michael F. Easley, in his capacity as Attorney General of

North Carolina, entered into an agreement (the “Agreement”) with Smithfield Foods,

Inc. (“Smithfield”) and several of its subsidiaries, Brown’s of Carolina, Inc., Carroll’s

Foods, Inc., Murphy Farms, Inc., Carroll’s Foods of Virginia, Inc., and Quarter M

Farms, Inc. (collectively, the “Companies”).

 Daniel Oakley, the former Division Director of the North Carolina Department

of Justice’s Environmental Division at the time the Agreement was negotiated and

entered into, stated in an affidavit:

 The background for the [Agreement] was a five-year period
 of time, from 1995 to 2000, when ruptured or flooded swine
 waste lagoons, not all of them Smithfield’s, had spilled
 millions of gallons of waste into North Carolina waterways,
 contaminating surface waters and killing aquatic life,

 -2-
 DE LUCA V. STEIN

 Opinion of the Court

 while seepage from waste lagoons impacted groundwater
 supplies.

 In the Agreement, the Department of Environmental Quality is referred to

under its previous name of the Department of Environment and Natural Resources,

or DENR. As of 1 July 2015, the agency was formally renamed the North Carolina

Department of Environmental Quality. 2015 S.L. 241, § 14.30.(c), eff. July 1, 2015.

We refer to the agency throughout this opinion under its current name of the

Department of Environmental Quality (“DEQ”).

 Under the terms of the Agreement, the Companies entered into it for the

purpose of undertaking “a series of environmental initiatives intended to preserve

and enhance water quality in eastern North Carolina.” To support “environmental

initiatives,” the Companies agreed to commit funds to “environmental enhancement

activities.” The Agreement specified these funds would be “paid to such organizations

or trusts as the Attorney General will designate. The funds will be used to enhance

the environment of the State, including eastern North Carolina, to obtain

environmental easements, construct or maintain wetlands and such other

environmental purposes, as the Attorney General deems appropriate.”

 In the Agreement, the Companies committed, among other things, to “pay each

year for 25 years an amount equal to one dollar for each hog in which the Companies

. . . have had any financial interest in North Carolina during the previous year,

provided, . . . that such amount shall not exceed $2 million in any year.” To facilitate

 -3-
 DE LUCA V. STEIN

 Opinion of the Court

these payments, the Companies maintain an escrow account into which funds are

deposited. The Attorney General maintains the sole authority to direct the escrow

agent to disburse funds to grant recipients, who are chosen by the Attorney General.

 Under the Agreement, the Attorney General may consult with the Companies,

DEQ, and “any other groups or individuals he deems appropriate and may appoint

any advisory committees he deems appropriate[,]” in administering the grant

program.

 To facilitate the administration of the funds in escrow, the Attorney General

established the Environmental Enhancement Grant Program (“EEG Program”).

Every year since the Agreement was established, the Attorney General has received

proposals from governmental agencies and nonprofit organizations to receive

Environmental Enhancement Grants (“EEGs”). A panel consisting of representatives

from the Department of Justice, DEQ, the North Carolina Department of Natural

and Cultural Resources, academic institutions, and environmental nonprofit

organizations reviews the EEG proposals and makes recommendations to the

Attorney General. Representatives from Smithfield could also submit

recommendations separate from the panel.

 The Attorney General exercises sole discretion over the selection of grant

recipients and approval of the amounts awarded, up to a maximum of $500,000 per

award. After the Attorney General selects the grant recipients, the funds are

 -4-
 DE LUCA V. STEIN

 Opinion of the Court

distributed as reimbursements for expenses already incurred by the grant recipients.

The Attorney General has awarded grants totaling more than $24 million since the

Agreement was signed.

 On 18 October 2016, Francis X. De Luca (“De Luca”), a citizen and resident of

Wake County, North Carolina, filed a complaint against the Attorney General of

North Carolina, Roy Cooper, in his official capacity. In his complaint, De Luca sought

a preliminary and permanent injunction to prevent the Attorney General from

distributing monies paid under the Agreement to any entities other than to the

State’s Civil Penalty and Forfeiture Fund.

 The Attorney General filed a motion to dismiss on 19 December 2016. On 25

January 2017, while the motion to dismiss was pending, De Luca filed an amended

complaint, which added the New Hanover County Board of Education (“NHCBE”) as

a party-plaintiff. Joshua H. Stein (“the Attorney General”), in his official capacity as

the current Attorney General of North Carolina, was substituted as the defendant.

The Attorney General subsequently filed an amended motion to dismiss.

 On 14 June 2017 and 16 June 2017, respectively, De Luca and the NHCBE

(collectively, “Plaintiffs”) filed a motion for preliminary injunction and a motion for

summary judgment. The trial court heard Plaintiffs’ motion for preliminary

injunction and the Attorney General’s amended motion to dismiss on 27 June 2017.

 -5-
 DE LUCA V. STEIN

 Opinion of the Court

 The trial court denied the Attorney General’s motion to dismiss and granted

Plaintiffs’ request for a preliminary injunction, based upon the court’s finding that

Plaintiffs were “likely to prevail” and “the public interest favors the granting of a

preliminary injunction.” The Attorney General filed an answer to the amended

complaint on 17 July 2017. On 21 July 2017, upon consent of the parties, an amended

injunction was entered to clarify the preliminary injunction would only apply to

grants awarded after 30 September 2016.

 On 21 August 2017, two environmental organizations, who had previously

received grants under the Agreement, the North Carolina Coastal Federation, Inc.

and Sound Rivers, Inc. (collectively, “Intervenors”), filed a motion to intervene. On

22 September 2017, Plaintiffs served their opposition to the motion to intervene and

renewed their motion for summary judgment. The same day, the Attorney General

filed a motion for summary judgment. On 28 September 2017, the Intervenors filed

a motion for leave to file a memorandum of law in support of the Attorney General’s

motion for summary judgment, and the North Carolina School Boards Association

(“NCSBA”) filed a motion for leave to file an amicus curiae brief in support of

Plaintiffs’ motion for summary judgment.

 The parties’ cross-motions for summary judgment, Intervenors’ motion to

intervene, and NCBSA’s motion for leave to file an amicus brief were heard by the

trial court on 5 October 2017. On 12 October 2017, the trial court entered its order,

 -6-
 DE LUCA V. STEIN

 Opinion of the Court

which granted the Attorney General’s motion for summary judgment, denied

Plaintiffs’ motion for summary judgment, dismissed Plaintiffs’ complaint with

prejudice, and dissolved the preliminary injunction previously entered by the trial

court. The trial court also entered orders granting Intervenors’ motion to intervene

and NCSBA’s motion for leave to file an amicus brief. On appeal, Plaintiffs do not

challenge the trial court’s order, to the extent it granted Intervenors’ motion to

intervene.

 From the trial court’s order granting the Attorney General’s motion for

summary judgment and denying their motion for summary judgment, Plaintiffs filed

timely notice of appeal on 25 October 2017.

 II. Jurisdiction

 Jurisdiction lies in this Court pursuant to N.C. Gen. Stat. § 7A-27(b) (2017) as

an appeal from a final judgment of the superior court.

 III. Standard of Review

 “Summary judgment is appropriate if the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that

there is no genuine issue as to any material fact and that [a] party is entitled to

judgment as a matter of law.” Summey v. Barker, 357 N.C. 492, 496, 586 S.E.2d 247,

249 (2003) (citation and internal quotation marks omitted); see N.C. Gen. Stat. § 1A-

1, Rule 56(c).

 -7-
 DE LUCA V. STEIN

 Opinion of the Court

 A defendant may show entitlement to summary judgment
 by (1) proving that an essential element of the plaintiff’s
 case is non-existent, or (2) showing through discovery that
 the plaintiff cannot produce evidence to support an
 essential element of his or her claim, or (3) showing that
 the plaintiff cannot surmount an affirmative
 defense. Summary judgment is not appropriate where
 matters of credibility and determining the weight of the
 evidence exist.

 Once the party seeking summary judgment makes the
 required showing, the burden shifts to the nonmoving
 party to produce a forecast of evidence demonstrating
 specific facts, as opposed to allegations, showing that he
 can at least establish a prima facie case at trial. To hold
 otherwise . . . would be to allow plaintiffs to rest on their
 pleadings, effectively neutralizing the useful and efficient
 procedural tool of summary judgment.

Draughon v. Harnett Cty. Bd. of Educ., 158 N.C. App. 208, 212, 580 S.E.2d 732, 735

(2003) (citations and quotation marks omitted), aff’d per curiam, 358 N.C. 131, 591

S.E.2d 521 (2004).

 “Our standard of review of an appeal from summary judgment is de novo[.]” In

re Will of Jones, 362 N.C. 569, 573, 669 S.E.2d 572, 576 (2008) (quoting Forbis v. Neal,

361 N.C. 519, 523-24, 649 S.E.2d 382, 385 (2007)). “The evidence produced by the

parties is viewed in the light most favorable to the non-moving party.” Hardin v. KCS

Int’l., Inc., 199 N.C. App. 687, 695, 682 S.E.2d 726, 733 (2009) (citation omitted). “If

the evidentiary materials filed by the parties indicate that a genuine issue of material

fact does exist, the motion for summary judgment must be denied.” Vernon, Vernon,

 -8-
 DE LUCA V. STEIN

 Opinion of the Court

Wooten, Brown & Andrews, P.A. v. Miller, 73 N.C. App. 295, 298, 326 S.E.2d 316, 319

(1985).

 Here, both parties moved for summary judgment and assert no genuine issues

of material fact exist. Under our de novo review of an order granting summary

judgment, we are not bound by the trial court’s conclusion or the parties’ contention

that no genuine issues of material fact exist. See MCC Outdoor, LLC v. Town of Wake

Forest, 222 N.C. App. 70, 75, 729 S.E.2d 694, 697 (2012) (denying summary judgment

on both the plaintiff’s and the defendant’s motions after determining genuine issues

of material fact existed).

 IV. Analysis

 A. Standing

 Intervenors argue Plaintiffs do not have standing to bring suit over the grant

funds provided in the Agreement. Standing refers to “a party’s right to have a court

decide the merits of a dispute[,]” and provides the courts of this State subject matter

jurisdiction to hear a party’s claims. Teague v. Bayer AG, 195 N.C. App. 18, 23, 671

S.E.2d 550, 554 (citation and internal quotation marks omitted).

 “[S]tanding is a necessary prerequisite to a court’s proper exercise of subject

matter jurisdiction and can be challenged at any stage of the proceedings, even after

judgment.” Willowmere Cmty. Ass’n, Inc. v. City of Charlotte, 370 N.C. 553, 561, 809

S.E.2d 558, 563-64 (2018) (internal quotation marks and citations omitted).

 -9-
 DE LUCA V. STEIN

 Opinion of the Court

“Standing is jurisdictional in nature and consequently, standing is a threshold issue

that must be addressed, and found to exist, before the merits of the case are judicially

resolved.” In re Miller, 162 N.C. App. 355, 357, 590 S.E.2d 864, 865 (2004).

 Standing is a question of law which this Court reviews de novo. Neuse River

Found., Inc. v. Smithfield Foods, Inc., 155 N.C. App. 110, 114, 574 S.E.2d 48, 51

(2002), disc. review denied, 356 N.C. 675, 577 S.E.2d 628 (2003).

 The Attorney General initially asserted De Luca lacked standing in a Rule

12(b)(6) motion to dismiss. The trial court ruled De Luca and NHCBE had standing

in its 14 July 2017 order granting Plaintiffs’ request for a preliminary injunction.

The Attorney General subsequently reasserted Plaintiffs’ lack of standing in a brief

in support of his motion for summary judgment. The trial court expressly declined to

revisit the issue of standing in its 12 October 2017 order, which granted Defendants’

motion for summary judgment. The trial court’s order states:

 In a prior order of the Superior Court, the Honorable
 Robert Hobgood presiding, the Court found that Plaintiffs
 DeLuca and the New Hanover Board of Education each had
 standing. Although Defendant raises this issue anew in
 arguing the current motion, the prior order of the Court
 will not be revisited by the undersigned.

 Intervenors, but not the Attorney General, argue on appeal that the Plaintiffs

lack standing. Neither the Attorney General nor the Intervenors appealed from the

trial court’s earlier order in which it concluded Plaintiffs each had standing.

Nevertheless “[s]tanding is a necessary prerequisite to a court’s proper exercise of

 - 10 -
 DE LUCA V. STEIN

 Opinion of the Court

subject matter jurisdiction,” Aubin v. Susi, 149 N.C. App. 320, 324, 560 S.E.2d 875,

878-79, disc. review denied, 356 N.C. 610, 574 S.E.2d 474 (2002), and “[a] challenge

to subject matter jurisdiction may be made at any time.” Whittaker v. Furniture

Factory Outlet Shops, 145 N.C. App. 169, 172, 550 S.E.2d 822, 824 (2001) (citations,

quotation marks, and ellipses in original omitted). Because, “subject matter

jurisdiction may not be waived, and this Court has not only the power, but the duty

to address the trial court’s subject matter jurisdiction[,]” we address Intervenors

arguments concerning standing. Rinna v. Steven B., 201 N.C. App. 532, 537, 687

S.E.2d 496, 500 (2009).

 1. De Luca’s Standing

 With regard to Plaintiff De Luca, Intervenors argue De Luca’s standing as a

taxpayer is “limited to challenges against the government for misuse or

misappropriation of public funds.” (Emphasis original). Intervenors contend this case

does not involve public or taxpayer funds because the grant funding at issue is

provided by private companies. This Court addressed the question of taxpayer

standing to bring suit under Article IX, § 7 of the North Carolina Constitution in

Fuller v. Easley, 145 N.C. App. 391, 553 S.E.2d 43 (2001).

 In Fuller, the plaintiff brought an action against then Attorney General Easley,

alleging the Attorney General had improperly diverted proceeds from numerous

lawsuits to a “public service message campaign.” Fuller, 145 N.C. App. at 393-94, 553

 - 11 -
 DE LUCA V. STEIN

 Opinion of the Court

S.E.2d at 45-46. The plaintiff alleged the lawsuit proceeds were required to be used

to fund public education pursuant to Article IX, § 7 of the State Constitution. Id. at

396, 553 S.E.2d at 47. The plaintiff brought the suit in his capacity as a taxpayer of

Wake County. Id. at 395, 553 S.E.2d at 46. The trial court dismissed the plaintiff’s

complaint for reasons unspecified in its order. Id. at 394, 553 S.E.2d at 46.

 On appeal, the plaintiff argued the trial court improperly dismissed his

complaint, in part, for lack of standing. Id. In addressing the plaintiff’s arguments,

this Court recited the rules regarding taxpayer standing, as follows:

 Generally, an individual taxpayer has no standing to bring
 a suit in the public interest. Green v. Eure, Secretary of
 State, 27 N.C. App. 605, 608, 220 S.E.2d 102, 105 (1975).
 However, the taxpayer may have standing if he can
 demonstrate:

 [A] tax levied upon him is for an unconstitutional,
 illegal or unauthorized purpose[;] that the carrying
 out of [a] challenged provision will cause him to
 sustain personally, a direct and irreparable injury[;]
 or that he is a member of the class prejudiced by the
 operation of [a] statute.

 Texfi Industries v. City of Fayetteville, 44 N.C. App. 268,
 270, 261 S.E.2d 21, 23 (1979) (citations omitted). Our
 review of plaintiff’s complaint reveals no allegations which
 allow him to sue as an individual taxpayer.

 Nonetheless, plaintiff may have had standing to bring a
 taxpayer action, not as an individual taxpayer, but on
 behalf of a public agency or political subdivision, if “ ‘the
 proper authorities neglect[ed] or refus[ed] to act.’ ” Guilford
 County Bd. of Comrs. v. Trogdon, 124 N.C. App. 741, 747,
 478 S.E.2d 643, 647 (1996) (quoting Branch v. Board of

 - 12 -
 DE LUCA V. STEIN

 Opinion of the Court

 Education, 233 N.C. 623, 625, 65 S.E.2d 124, 126 (1951)).
 To establish standing to bring an action on behalf of public
 agencies and political divisions, a taxpayer must allege

 that he is a taxpayer of [that particular] public
 agency or political subdivision, . . . [and either,] “(1)
 there has been a demand on and refusal by the
 proper authorities to institute proceedings for the
 protection of the interests of the political agency or
 political subdivision; or (2) a demand on such
 authorities would be useless.”

 Id. (citation omitted).

Id. at 395-96, 553 S.E.2d at 46-47. This Court concluded the plaintiff in Fuller lacked

standing because he had “failed to allege that the Wake County Board of Education

or any other Board of Education refused to bring a suit to recover funds, that he

requested the Board do so, or that such a request would be futile.” Id. at 396, 553

S.E.2d at 47.

 Upon reviewing Plaintiffs’ complaint, Plaintiffs have failed to allege any basis

upon which De Luca may sue solely upon his capacity as a taxpayer. De Luca has

not alleged that: (1) the payments at issue constitute an illegal or unconstitutional

tax; (2) the Agreement has caused him a personal, direct, and irreparable injury; or,

(3) he is a member of a class prejudiced by the Agreement. See Texfi, 44 N.C. App. at

270, 261 S.E.2d at 23.

 De Luca’s complaint also fails to allege he had made any demand upon proper

authorities to bring suit, or that such a demand would be futile or useless. See

 - 13 -
 DE LUCA V. STEIN

 Opinion of the Court

Trogdon, 124 N.C. App. at 747, 478 S.E.2d at 647. Under our precedents, De Luca

has not alleged a basis to sustain his standing to challenge the Attorney General’s

alleged violation of Article IX, § 7 of our State Constitution. See Fuller, at 394, 553

S.E.2d at 46.

 2. NHCBE’s Standing

 Intervenors also argue NHCBE does not have standing because it has not

demonstrated “any injury in fact from the creation or execution of the Smithfield

Agreement” and “[n]either plaintiff has presented any evidence to support a claim

that the Agreement has deprived them of payments to which they are entitled.” We

disagree.

 Taking the allegations in Plaintiffs’ amended complaint as true and the monies

paid by the Companies under the Agreement as penalties, then NHCBE would be an

intended beneficiary of a portion of those monies under Article IX, § 7 of the State

Constitution and under N.C. Gen. Stat. § 115C-457.2 (2017), which requires all “civil

penalties, civil forfeitures, and civil fines” to be placed in the Civil Penalty and

Forfeiture Fund for the benefit of the public schools.

 Intervenors argument that NHCBE has failed to demonstrate standing is

dependent upon viewing the allegations in Plaintiffs’ amended complaint in light of

the evidence in the record. However, whether a party has standing

 is determined at the time of the filing of a complaint. “Our
 courts have repeatedly held that standing is measured at

 - 14 -
 DE LUCA V. STEIN

 Opinion of the Court

 the time the pleadings are filed. The Supreme Court has
 explained that ‘[w]hen standing is questioned, the proper
 inquiry is whether an actual controversy existed’ when the
 party filed the relevant pleading.” Quesinberry v.
 Quesinberry, [196 N.C. App. 118, 123], 674 S.E.2d 775, 778
 (2009) (citation omitted).

Metcalf v. Black Dog Realty, LLC, 200 N.C. App. 619, 625, 684 S.E.2d 709, 714 (2009).

 Viewing the allegations in Plaintiffs’ complaint in the light most favorable to

NHCBE, NHCBE would be an intended beneficiary of the monies the Companies

have paid or are obligated to pay under the Agreement pursuant to Article IX, § 7 of

the State Constitution. NHCBE has alleged that they have been deprived of money

to which they are constitutionally entitled, and have consequently alleged an injury

in fact. NHCBE has standing to maintain this action against the Attorney General

and Intervenors. Intervenors’ arguments are overruled.

 B. N.C. Constitution Article IX, § 7

 Plaintiffs and the NCSBA argue the trial court erred in granting the Attorney

General’s motion for summary judgment, and denying Plaintiffs’ motion, because the

monies paid by the Companies under the Agreement are “penalties” pursuant to

Article IX, § 7 of the North Carolina Constitution, as a matter of law. N.C. Const. art.

IX, § 7.

 Article IX, § 7 mandates “the clear proceeds of all penalties and forfeitures and

of all fines collected in the several counties for any breach of the penal laws of the

State, shall belong to and remain in the several counties, and shall be faithfully

 - 15 -
 DE LUCA V. STEIN

 Opinion of the Court

appropriated and used exclusively for maintaining free public schools.” N.C. Const.

art. IX, § 7(a). Supplementing funding for public schools with proceeds from

“penalties, forfeitures, and fines” as unbudgeted, non-recurring sources of revenue

reflects North Carolina’s stated and strong public policy to support public education.

See generally David M. Lawrence, Fines, Penalties, and Forfeitures: An Historical and

Comparative Analysis, 65 N.C. L. Rev. 49, 54-59 (1986).

 The general statutes mandate that the proceeds of penalties and other monies

within the scope of Article IX, § 7 must be remitted by the collecting agency to the

Office of State Management and Budget in order for the proceeds to be deposited in

the State’s Civil Penalty and Forfeiture Fund. N.C. Gen. Stat. §§ 115C-457.2, -457.3

(2017).

 The Supreme Court of North Carolina has defined a “penalty” to be an amount

collected under a “penal law[ ],” or a “law[ ] that impose[s] a monetary payment for

[its] violation [where] [t]he payment is punitive rather than remedial in nature and

is intended to penalize the wrongdoer rather than compensate a particular party.”

Mussallam v. Mussallam, 321 N.C. 504, 509, 364 S.E.2d 364, 366-67 (emphasis

supplied), reh’g denied, 322 N.C. 116, 367 S.E.2d 915 (1988).

 “[A]n assessment is a penalty or a fine if it is ‘imposed to deter future violations

and to extract retribution from the violator’ for his illegal behavior.” Shavitz v. City of

High Point, 177 N.C. App. 465, 475, 630 S.E.2d 4, 12 (2006) (emphasis supplied)

 - 16 -
 DE LUCA V. STEIN

 Opinion of the Court

(quoting N.C. School Bds. Ass’n v. Moore, 359 N.C. 474, 496, 614 S.E.2d 504, 517

(2005)).

 1. Civil Penalties

 Plaintiffs and NCBSA assert our Supreme Court’s holdings in Craven County

Bd. of Education v. Boyles, 343 N.C. 87, 468 S.E.2d 50 (1996), and Moore, 359 N.C.

474, 614 S.E.2d 504, support their arguments that the monies paid pursuant to the

Agreement are civil “penalties” and are required to be remitted to the Civil Penalty

and Forfeiture Fund. The Attorney General and Intervenors argue the monies paid

under the Agreement are not “penalties” because the payments were made

“voluntarily” by the Companies, and were not intended to penalize the Companies for

any environmental violations “or to deter future violations.” See Shavitz, 177 N.C.

App. at 475, 630 S.E.2d at 12. We disagree.

 In Moore, the City of Kinston had been cited for environmental violations. 359

N.C. at 507-08, 614 S.E.2d at 524. The City of Kinston entered into a settlement

agreement with DEQ, under which it agreed to fund a “Supplemental Environmental

Project” in lieu of paying a civil penalty. Id. DEQ had established Supplemental

Environmental Projects as an alternative enforcement mechanism under which

environmental violators would agree to fund “projects that are beneficial to the

environment and/or to public health” as part of settlements to enforcement actions.

Id. at 508, 614 S.E.2d at 525.

 - 17 -
 DE LUCA V. STEIN

 Opinion of the Court

 The Supreme Court of North Carolina considered whether the monies paid by

the City of Kinston to fund a Supplemental Environmental Project were subject to

Article IX, § 7 of our State Constitution. Id. at 507-08, 614 S.E.2d at 524. The Court

concluded the monies at issue were subject to Article IX, § 7, in part because:

 The payment would not have been made had [DEQ] not
 assessed a civil penalty against [the violator] for violating
 a water quality law. To suggest that the payment was
 voluntary is euphemistic at best. Moreover, the money
 paid under the [Supplemental Environmental Project] did
 not remediate the specific harm or damage caused by the
 violation even though a nexus may exist between the
 violation and the program [funded by the payment.]

Id. at 509, 614 S.E.2d at 525 (emphasis supplied).

 In Boyles, a company had been formally assessed a civil penalty by DEQ of

$1,466,942.44. Boyles, 343 N.C. at 88, 468 S.E.2d at 51. The company sought

administrative review of the penalty in the Office of Administrative Hearings. Before

the matter was adjudicated, the parties settled. Id. The settlement required the

company to pay $926,000, but recited that the vast majority of this amount was not

a penalty, but instead was made to redress harm to the environment. Id. at 88-89,

468 S.E.2d at 51. Despite DEQ and the company explicitly specifying the settlement

amount to not be a penalty, our Supreme Court had determined the settlement

payments were “covered by Article IX, Section 7.” Id. at 91, 468 S.E.2d at 52.

 The Court based its determination primarily upon the fact the company had

“entered into a settlement agreement” with DEQ “after the department found that

 - 18 -
 DE LUCA V. STEIN

 Opinion of the Court

the company had violated state environmental standards and assessed a civil penalty

against” the company “for violation of those standards.” Id. The company had

subsequently “filed for a contested [case] hearing and then settled with the

department in lieu of contesting the civil penalty that had been assessed.” Id. The

payments fell within the scope of Article IX, § 7 because they were “paid because of a

civil penalty assessed against” the company. Id. (emphasis supplied).

 2. Genuine Issues of Material Fact

 To support their assertions that the monies the Companies agreed to pay under

the Agreement before us are not penalties, the Attorney General refers to several

affidavits submitted in support of his motion for summary judgment. In the affidavit

of Alan Hirsch, he averred that negotiations of the Agreement were initiated in 1999

by Hirsch, the then Director of the Consumer Protection Division of the North

Carolina Department of Justice under the direct authority of the Attorney General.

 Hirsch and representatives of the Companies took approximately eight months

to negotiate the Agreement. Attorneys from the Department of Justice’s

Environmental Division were also involved throughout the negotiation process,

purportedly “[t]o be certain that there was nothing in the language of the draft

agreement that could be read to limit or affect in any way the compliance

responsibilities of [DEQ].”

 - 19 -
 DE LUCA V. STEIN

 Opinion of the Court

 Hirsch averred “the Agreement was not reached in order to settle any cases in

which a civil penalty had been issued or might later be issued[,]” and “[t]he

Agreement did not arise from or address any actual or alleged violations of law or

regulation on the part of Smithfield. No penalties or punitive action of any sort was

ever discussed or considered. The Agreement was not, and is not, punitive.”

 Regarding the Companies reasons for entering the Agreement, Hirsch stated:

 9. I believe the purpose from Smithfield’s perspective was
 to solve a long running problem of major public concern, to
 demonstrate good corporate citizenship by working
 towards better waste management solutions, and to
 further its public standing by making additional
 enhancements of North Carolina’s environment. The
 image of the industry was under intense scrutiny by the
 press, citizens and the General Assembly, all a matter of
 great concern to the industry.

 Daniel Oakley stated in his affidavit:

 21. As a primary negotiator of [the Agreement], . . . I know
 that the [Agreement] was not reached in order to settle any
 cases in which a civil penalty had been assessed by [DEQ].
 As Director of the Environmental Division, I know that no
 civil penalty being defended by attorneys in my Division
 was settled, compromised, or in any way impacted by the
 negotiation or execution of the [Agreement].

 ...

 24. Although there were Notices of Violation and Civil
 Penalty Assessments issued to various hog farms from
 1995 to 2001, any Civil Penalty Assessments were resolved
 by other means and were not part of the Agreement at issue
 in this case.

 - 20 -
 DE LUCA V. STEIN

 Opinion of the Court

 The sworn attestations in these affidavits purport the payments the

Companies undertook to pay under the Agreement are not punitive because they did

not resolve any past, present, or future violations of environmental laws.

Nonetheless, several factors in the record raise genuine issues of material fact

regarding whether the payments were “intended to penalize” the Companies or were

“imposed to deter future violations and to extract retribution from” the Companies.

Mussallam, 321 N.C. at 509, 364 S.E.2d at 367; Moore, 359 N.C. at 496, 614 S.E.2d

at 517.

 First, it is undisputed by the parties that the negotiating and consummating

of the Agreement was instigated at the behest of and initiated by the Attorney

General’s office, and not by the Companies. If the Agreement was purportedly sought

or undertaken by the Companies to “demonstrate good corporate citizenship” and to

“improve the image” of the hog farming industry, as attested to by Alan Hirsch, and

not to penalize the Companies for environmental or other legal violations or coerce

the Companies’ compliance with such laws, a genuine issue of material fact exists

regarding why the impetus for the Agreement was instigated from the office of the

Attorney General, the chief law enforcement officer of the State, and not from DEQ

or the Companies, or why the Attorney General retains sole authority over the

disbursements of the funds. See In re Investigation by Attorney General, 30 N.C. App.

585, 589, 227 S.E.2d 645, 648 (1976) (“The Attorney General is . . . the State’s chief

 - 21 -
 DE LUCA V. STEIN

 Opinion of the Court

law enforcement officer”).

 Second, the basis, formula, and manner in which the amounts are calculated

for the Companies to pay each year under the Agreement are apparently based more

in penalties, or a “head tax” calculation, rather than “voluntary contributions”

designed to enhance the Companies’ “good corporate citizenship,” images or goodwill,

and created issues of fact. The Agreement specifically provides:

 The Companies agree to pay each year for 25 years an
 amount equal to one dollar for each hog in which the
 Companies (including, for such purpose, any successor-in-
 interest of any of the Companies, by merger, sale of stock
 or assets or otherwise) have had any financial interest in
 North Carolina during the previous year, provided,
 however, that such amount shall not exceed $2 million in
 any year. For purposes of this paragraph, the Companies
 have a financial interest in any hog that, inter alia, they
 (or their nonparty subsidiaries or affiliates) raise, produce,
 contract for, own or slaughter.

 The record does not disclose the reasoning upon which the Companies agreed

to pay the annual amount of $1-per-hog for 25 years. If the Companies were purely

motivated out of a desire to further their corporate image, as the Attorney General

contends, it is not apparent why they would agree to pay $1-per-hog over 25 years as

opposed to a specific lump sum or stated contribution.

 We note that the per-hog payments specified under the Agreement bears a

resemblance to the per-cigarette payments the General Assembly enacted in the late

1990s to implement the Master Settlement Agreement with tobacco manufacturers

 - 22 -
 DE LUCA V. STEIN

 Opinion of the Court

to settle lawsuits filed by several states’ Attorneys General, including Attorney

General Easley, over healthcare costs stemming from tobacco use.

 In November 1998, North Carolina and forty-five other
 states signed a Master Settlement Agreement (MSA) with
 four major tobacco manufacturers for the purpose of
 settling claims that North Carolina could have otherwise
 asserted against those manufacturers arising from
 smoking-related health care costs incurred by the State as
 a result of the consumption of the major manufacturers’
 products. The General Assembly enacted a series of
 statutory provisions entitled the Tobacco Reserve Fund
 and Escrow Compliance Act (Act) in July, 1999 in order to
 effectuate the MSA. Pursuant to that legislation, all
 cigarette manufacturers doing business in North Carolina
 were made subject to N.C. Gen. Stat. § 66-291, which
 required them to choose between either (1) participating in
 the MSA or (2) paying certain specified sums, computed on
 the basis of the quantities of cigarettes sold by April 15 of
 each year, into a special fund. See State ex rel. Cooper v.
 Ridgeway Brands Mfg., LLC, 362 N.C. 431, 433, 666 S.E.2d
 107, 109 (2008). More specifically, N.C. Gen. Stat. § 66-291
 provides that:

 (a) Any tobacco product manufacturer selling cigarettes to
 consumers within the State (whether directly or through a
 distributor, retailer, or similar intermediary or
 intermediaries) after the effective date of this Article shall
 do one of the following:

 (1) Become a participating manufacturer (as that term is
 defined in section II(jj) of the Master Settlement
 Agreement) and generally perform its financial obligations
 under the Master Settlement Agreement;   or

 (2) Place into a qualified escrow fund by April 15 of the year
 following the year in question the following amounts (as
 such amounts are adjusted for inflation): . . . .

 - 23 -
 DE LUCA V. STEIN

 Opinion of the Court

 [e. For each of 2007 and each year thereafter: $.0188482
 per unit sold.]

 N.C. Gen. Stat. § 66-291(a). The funds placed in escrow
 pursuant to N.C. Gen. Stat. § 66-291(a)(2) are intended to
 provide a source from which any judgment for
 reimbursement of medical costs obtained by the State
 against a nonparticipating manufacturer resulting from
 the consumption of cigarettes produced by that
 nonparticipating manufacturer can be satisfied.

State ex rel. Cooper v. Seneca-Cayuga Tobacco Co., 197 N.C. App. 176, 177-78, 676

S.E.2d 579, 581 (2009) (emphasis supplied) (citing N.C. Gen. Stat. § 66-291(a)).

 Under the MSA:

 In return for the states dropping their suits against the
 four companies, the companies agreed to pay the states
 $206 billion over twenty-five years. Thereafter, payments
 were to continue to be based on the quantity of cigarette
 sales of each company. Payment was made as
 compensation for the additional cost that state Medicaid
 programs had allegedly incurred for treatment of Medicaid
 recipients with smoking-related diseases and as a penalty
 for deceptive trade practices of the companies.

Frank Sloan & Lindsey Chepke, Litigation, Settlement, and the Public Welfare:

Lessons from the Master Settlement Agreement, 17 Widener L. Rev. 159, 161 (2011).

 Unlike the tobacco MSA, the Attorney General and Intervenors contend the

Agreement with the Companies before us is not a settlement agreement, as it

purportedly did not “settle” any legal claims. However, a genuine issue of material

fact exists of whether the Agreement was motivated by a desire by the Companies to

 - 24 -
 DE LUCA V. STEIN

 Opinion of the Court

forestall, or forebear, any potential claims the Attorney General or DEQ could have

asserted against them.

 If so, an issue of fact exists of whether the Companies would not have agreed

to make the payments at issue, but for potential legal claims, and consequent civil

penalties or fines, the Attorney General could have asserted against them. See Moore,

359 N.C. at 509, 614 S.E.2d at 525 (holding, in part, that a payment made by the City

of Kinston to fund environmental programs in lieu of civil penalties asserted by DEQ

was a penalty subject to Article IX, § 7).

 The timing of enforcement actions taken against the Companies and

subsequent facts also raise genuine issues of material fact with regard to whether the

payments under the Agreement were intended to be punitive, or in lieu of

enforcement actions asserted against the Companies. Records before the Court of

DEQ enforcement actions against the Companies presented by Plaintiffs highlight

that a number of the Companies had civil penalties assessed against them in the time

period preceding and following the signing of the Agreement.

 In the fourteen months preceding the signing of the Agreement, DEQ assessed

nine civil penalties against the Companies for environmental violations. In the eight

months following the signing of the Agreement, DEQ assessed nine additional

penalties against the Companies. Eight of these civil penalties were paid in full by

the Companies, including six that were paid in full after the Agreement was signed.

 - 25 -
 DE LUCA V. STEIN

 Opinion of the Court

Seven penalties were settled for discounted amounts. Although the Companies paid

many of these civil penalties after the Agreement was executed on 25 July 2000, all

were for notices of violations accrued or issued by DEQ before the Agreement was

executed. The record before us does not demonstrate DEQ issued any notices of

violations to the Companies after the Agreement was signed.

 This apparent discrepancy between the number of notices of violations issued

to the Companies before and after the Agreement was signed raises genuine issues of

material fact regarding whether the Attorney General, DEQ, and the Companies

intended for the Agreement, and the payments specified therein, to be in lieu of

further enforcement actions, and their related civil penalties, against the Companies.

Whether these payments were “intended to penalize” the Companies or were

“imposed . . . to deter future violations and to extract retribution from” the Companies

is an issue of fact, which remains to be resolved. Mussallam, 321 N.C. at 509, 364

S.E.2d at 366-67; Moore, 359 N.C. at 496, 614 S.E.2d at 517.

 Another genuine issue of material fact, concerning whether the payments were

intended to penalize the Companies, is also raised by the express terms of the

Agreement. In addition to the commitment to pay up to $50 million for environmental

enhancement activities, the Companies also committed in the Agreement to

implement plans to correct “deficient site conditions or operating practices” on

properties and operations they owned. The Companies also committed to implement

 - 26 -
 DE LUCA V. STEIN

 Opinion of the Court

what the Agreement refers to as “Environmentally Superior Technologies.” The

Agreement specifies, “[i]mplementation will include the installation and operation of

monitoring equipment and procedures needed to ensure compliance with applicable

environmental standards, in accordance with the applicable permit conditions.”

(Emphasis supplied).

 The question of why the Companies committed to undertake actions to

remediate deficient conditions on their farms and operations, install equipment, and

additionally pay up to $50 million raises the issue of whether the $50 million in

additional payments was intended to penalize the Companies for non-compliance

with environmental standards or to induce forbearance on the part of the Attorney

General, or DEQ, in bringing future enforcement actions. This is especially pertinent

in light of the Companies relinquishing any control over to whom and in what

amounts the Attorney General distributes the environmental grants.

 Another genuine issue of material fact concerning whether these payments

were intended to be penalties is raised by two official and public communications

issued by the Attorney General’s office in 2002 and 2013, respectively. Both of these

communications expressly refer to the Agreement as a “settlement.” Whether the

Agreement is, in fact, a “settlement” is not ultimately determinative of whether the

payments are penalties. See Boyles, 343 N.C. at 92, 468 S.E.2d at 53 (stating “it is not

determinative that the monies were collected by virtue of a settlement agreement”).

 - 27 -
 DE LUCA V. STEIN

 Opinion of the Court

However, the Attorney General’s reference to the Agreement as a “settlement” in

these press releases raises a genuine issue of material fact of whether the parties

intended for the Agreement, and the payments thereunder, to be in lieu of any

potential claims or enforcement actions the Attorney General or DEQ could have

brought against the Companies.

 Based upon the genuine issues of material fact regarding whether these

payments, instigated at the Attorney General’s behest, were “intended to penalize”

the Companies or were “imposed . . . to deter future violations and to extract

retribution from” the Companies, the superior court incorrectly concluded these

payments constitute civil penalties as a matter of law.

 V. Conclusion

 Genuine issues of material fact exist to preclude summary judgment for the

parties. The record on appeal is not sufficiently developed for us to make the de novo

determination of whether the payments undertaken by the Companies under the

Agreement were, as a matter of law, “penalties” within the scope of Article IX, § 7 of

our State Constitution. Whether these payments are penalties depends upon

whether they were “intended to penalize” the Companies or “imposed to deter future

violations and to extract retribution.” Mussallam, 321 N.C. at 509, 364 S.E.2d at 366-

67; Moore, 359 N.C. at 496, 614 S.E.2d at 517.

 - 28 -
 DE LUCA V. STEIN

 Opinion of the Court

 We reverse the trial court’s order, which determined that the payments are not

penalties as a matter of law. We remand to the trial court for trial to determine

whether the payments in the Agreement were intended to constitute penalties,

payment in lieu of penalties, forbearance for potential or future enforcement actions,

or were not penalties. The order of the trial court, which granted Defendant’s motion

for summary judgment, is reversed. This matter is remanded for trial. It is so

ordered.

 REVERSED AND REMANDED.

 Judge BERGER concurs.

 Judge BRYANT dissents with separate opinion.

 - 29 -
 No. COA17-1374 – De Luca v. Stein

 Bryant, Judge, dissenting.

 The majority holds that genuine issues of material fact exist so as to preclude

summary judgment because the “record on appeal is not sufficiently developed for us

to make the determination of whether the payments undertaken by the Companies

[(Smithfield Foods, Inc., and subsidiaries)] under the Agreement were ‘penalties’

within the scope of Article IX § 7 of our State Constitution.” The majority goes on to

state that “[w]hether these payments are penalties depends upon whether they were

‘intended to penalize’ the Companies or ‘imposed to deter future violations and to

extract retribution.’ ” Because I believe the record on appeal is sufficient to make a

determination as a matter of law on the question before this Court, I respectfully

dissent.

 The trial court concluded as a matter of law that funds paid pursuant to the

agreement between the North Carolina Attorney General and the Companies were

not subject to Article IX of the North Carolina Constitution and should not be

remitted to the Civil Penalty and Forfeiture Fund. The question before this Court is

whether the trial court erred in reaching this conclusion. I submit the trial court did

not err.

 I disagree with the majority’s determination that there are genuine issues of

material fact—a determination that is not otherwise supported herein. The record is

replete with affidavits and submissions on the very matters for which the majority

would have the trial court hold another hearing. In the summary judgment hearing
 DE LUCA V. STEIN

 Bryant, J., dissenting

before the trial court and in the arguments made before this Court, there was no

argument that the case was not ripe for summary judgment or that genuine issues of

material fact were yet to be decided. In fact, plaintiff-appellant states:

 The question before the trial court was a matter of law—
 whether the Smithfield Agreement constituted a
 settlement agreement such that the Section III.D
 payments must be remitted to the Civil Penalty and
 Forfeiture Fund. . . . ONLY A QUESTION OF LAW
 REMAINS . . . Plaintiffs have consistently maintained this
 case is one “where only a question of law on the
 indisputable facts is in controversy.”

(citation omitted). Plaintiffs then go on to outline what they consider to be the

relevant, indisputable facts, none of which are in controversy. They, and all parties,

acknowledge the only matter in controversy is the legal issue that has been appealed

to this Court.

 By determining that material issues of fact exist and that the matter should

be remanded to the trial court, this Court has created an argument none of the parties

anticipated. See Viar v. N. Carolina Dep’t of Transp., 359 N.C. 400, 402, 610 S.E.2d

360, 361 (2005) (“It is not the role of the appellate courts, however, to create an appeal

for a[] [party]. As this case illustrates, the Rules of Appellate Procedure must be

consistently applied; otherwise, the Rules become meaningless, and an [opposing

party] is left without notice of the basis upon which an appellate court might rule.”

(citation omitted)).

 2
 DE LUCA V. STEIN

 Bryant, J., dissenting

 Therefore, based on the voluminous evidence before this Court, I would reach

the main legal issue before us—which is the same issue that was before the trial

court—hold that the trial court properly applied the law to the undisputed material

facts of this case, and affirm the judgment of the trial court.

 3